**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

ELIJAH SMITH,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, COLORADO,
MIKE'S RESTAURANT GROUP d/b/a HAYTER'S & CO.,
ADAM GLASBY, in his individual capacity,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Elijah Smith, by and through his attorneys Mari Newman and Andy McNulty of NEWMAN | MCNULTY, LLC, respectfully alleges for his Complaint and Jury Demand as follows:

## I. INTRODUCTION

1.      For most Denver sports fans, June 12, 2023, was a night of jubilation. The Denver Nuggets had just won their first ever National Basketball Association championship. Exuberant fans flooded the streets of lower downtown. People whooped. People hollered. People climbed street light poles. The night seemed to stretch into a joyful blue and gold blur. But, in the midst of this celebratory scene, Denver Police Department ("DPD") officer Adam Glasby, working as security for Defendant Mike's Restaurant Group d/b/a Hayter's & Co. (Hayter's), brutally assaulted Elijah Smith outside of Hayter's bar in lower downtown Denver. While Mr. Smith was trying to defend his friend who was being attacked by a drunk reveler, Defendant Glasby came up behind Mr. Smith, grabbed him, threw him in the air up to at least shoulder height, and slammed him head-first into the concrete. Not only did Mr. Smith lose consciousness that night,

but as of the first anniversary of Defendants' brutal assault on him, he has now lost a year of his life to the debilitating effects of a traumatic brain injury, and he continues to suffer its long-term effects.

2.      Defendant Glasby's brutal assault on Mr. Smith was inexcusable, but unfortunately not novel conduct for a DPD officer. Denver has a long and sordid history of condoning DPD officers' use of excessive force. Three years prior to Defendant Glasby's brutalization of Mr. Smith, DPD officers used widespread excessive force during the protests in the summer of 2020 after the murder of George Floyd (the last time there was a crowd as large as the night the Nuggets won the championship). During those protests, DPD officers inflicted unnecessary and disproportionate force, often against people of color, because they were so poorly trained and supervised. Instead of taking action to ensure that these officers could not again brutalize those who take to the streets during large gatherings, Defendant City and County of Denver ("Denver") meted out almost no discipline against the officers who had blatantly brutalized demonstrators. Denver imposed virtually no accountability for the officers who routinely violated protesters' constitutional rights. And, instead, Denver condoned and defended the actions of its officers all the way through a trial in which a jury, outraged by the widespread brutality inflicted by DPD officers during the George Floyd gathering, unanimously awarded a group of eleven protesters fourteen million dollars. Denver refused to accept even this modicum of accountability and appealed the jury's well-reasoned decision.

3.      Against this backdrop, it is no surprise that Defendant Glasby thought he was allowed to slam Mr. Smith, headfirst, into the concrete. He had watched as his DPD comrades used force that broke people's necks, shot out their eyes, ruptured testicles, and left them concussed without so much as a slap on the wrist. With little risk that he would face any

consequences from Denver DPD, Defendant Glasby lived out his fantasy of cracking skulls with the backing of the full power of the DPD.

4.     Mr. Smith brings this action to demand accountability from Defendant Denver. He seeks compensation for the pain and suffering he has endured because of the brutality inflicted on him by Defendant Glasby, Defendant Denver, and Defendant Hayter's. He brings this action to vindicate his rights.

## II. <u>PARTIES</u>

5.     At all times pertinent to the subject matter of this litigation, Plaintiff Elijah Smith was a citizen of the United States of America and was present in Denver, Colorado.

6.     Defendant Denver is a Colorado municipal corporation.

7.     Defendant Mike's Restaurant Group, Inc. d/b/a Hayter's & Co. is a Colorado corporation. Defendant Hayter's is doing business at 1920 Blake Street, Denver, Colorado 80202 and is incorporated at 3769 Dahlia Street, Denver, Colorado 80207.

8.     At all times pertinent to the subject matter of this litigation, Defendant Adam Glasby was a citizen of the United States and resident of and domiciled in Colorado. At all times pertinent, Defendant Glasby was acting within the scope of his official duties and employment and under color of state law in his capacity as a law enforcement officer employed by the DPD. Defendant Glasby is a peace officer employed by a local government and, therefore, is subject to suit under C.R.S. § 13-21-131.

## III. <u>JURISDICTION AND VENUE</u>

9.     This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.

10.    Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

11.    Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988 and C.R.S. § 13-21-131.

12.    Venue is proper in this District according to 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in this District and all Defendants reside in this District.

## IV. FACTUAL ALLEGATIONS

**A.    Defendant Glasby, acting under color of state law as a Denver Police Officer, and as an agent of Defendant Hayter's, brutally assaulted Elijah Smith and then failed to ensure that Mr. Smith receive necessary medical care.**

13.    On June 12, 2023, the Denver Nuggets won the National Basketball Association championship. After the final buzzer, Nuggets fans Nuggets took to the streets as downtown Denver erupted in a massive celebration. Fans shared moments of joy, waved flags and banners, chanted, and otherwise engaged in revelry.

14.    The highest concentration Nuggets fans congregated in the area of Lower Downtown that has blocks of sports bars along Blake Street and Larimer Street. One of those bars was Defendant Hayter's.

15.    Plaintiff Elijah Smith was among those celebrating the Nuggets' win on the night of June 12, 2023. As the night of June 12th bled into the early morning of June 13th, Mr. Smith was with a few friends outside of Defendant Hayter's.

16.    One of Mr. Smith's friends got involved in an altercation with another member of the crowd. Mr. Smith, seeing his friend being attacked, quickly moved to defend his friend.

17.     Almost immediately, Mr. Smith was grabbed from behind by Defendant Adam Glasby, a DPD officer who was working that night as a bouncer for Defendant Hayter's. Defendant Glasby gave Mr. Smith no warning when he approached him from behind and grabbed him. Defendant Glasby never told Mr. Smith to freeze or identified himself as a police officer.

18.     Instead of attempting to secure Mr. Smith, Defendant Glasby lifted him off of the ground to shoulder-height and immediately slammed Mr. Smith down, head-first, into the concrete. The maneuver performed by Defendant Glasby resembled a professional wrestling "power-bomb". Defendant Glasby's dynamic tackle was wholly unnecessary. At no point to Mr. Smith threaten Defendant Glasby, attempt to flee, resist Defendant Glasby, or disobey any command from Defendant Glasby. In fact, Mr. Smith never even saw Defendant Glasby.

19.     The impact from being slammed to the ground head-first by Defendant Glasby immediately knocked Mr. Smith unconscious. Mr. Smith lay on the ground, unconscious and not moving, for quite a while.

20.     During that time, Defendant Glasby did not call 911 or otherwise summon emergency medical attention, despite knowing that Mr. Smith had been knocked unconscious and needed immediate medical attention. Instead of calling for medical attention, Defendant Glasby left Mr. Smith before he regained consciousness.

21.     After Mr. Smith regained consciousness, one of Mr. Smith's friends put Mr. Smith's arm around his shoulder and helped him stagger out of the crowd and to safety. As Mr. Smith was being helped out of the crowd by Mr. Trujillo, he was wobbly and dragging his feet. At one point, Mr. Smith asked Mr. Trujillo is he could lay down and sleep, but Mr. Trujillo ensured that Mr. Smith was immediately was transported by his friend to Denver Health.

22.     Once at Denver Health, Mr. Smith was diagnosed with a subarachnoid hemorrhage (brain bleed) and neurapraxia of left upper extremity (damage to the nerves in his shoulder). Both of these injuries were caused by Defendant Glasby's use of excessive force.

23.     When Defendant Glasby was working at Defendant Hayter's, he had full authority from Defendant Hayter's to patrol the area surrounding the establishment. Defendant Hayter's gave Defendant Glasby the authority to use force as he saw fit and placed no limitations on his ability to mete out justice in any way he deemed appropriate. Upon information and belief, Defendant Hayter's gave Defendant Glasby this authority with no oversight and no training.

24.     Defendant Glasby was acting under color of state law in all of his actions related to Mr. Smith. Defendant Glasby was: (1) wearing his official DPD badge on his chest, (2) wearing a DPD uniform, (3) wearing a DPD issued body-worn camera, (4) carrying his DPD service weapon, (5) wearing his official DPD utility belt, and (6) clearly identified as a DPD police officer.

25.     Demonstrating that Defendant Glasby was clearly identified as a DPD officer, after Defendant Glasby slammed Mr. Smith head-first, into the concrete, one bystander repeatedly yelled at Defendant Glasby, "police brutality!"

26.     Further, Defendant Glasby informed his DPD supervisor that he was involved in a use of force incident while working as a DPD officer after using force against Mr. Smith.

27.     Defendant Glasby's conduct was so extreme that he was criminally prosecuted, and (as part of a sweetheart deal) ultimately pled guilty to the crime of Reckless Endangerment. During Defendant Glasby's criminal proceedings, the DPD official who led the internal affairs investigation into Defendant Glasby's conduct, Randy Stanke, testified that Defendant Glasby was only allowed to take the actions he did with respect to Mr. Smith, including using force

against him, because he was authorized to do so by DPD. Defendant Glasby also admitted

(through his attorneys) that he was acting as a DPD officer when he used force against Mr.

Smith, arguing that (1) he should not be liable for the use of force because he was acting as a

DPD officer, and (2) that the *Graham* factors applied to uses of force by acting members of law

enforcement were a defense to his charges.

28.    Notably, a full year after Defendant Glasby's assault on Mr. Smith, Denver's IAB

has still not completed its so-called "investigation" of the incident. Denver is using this

unjustifiable delay as an excuse to deny Mr. Smith and the public their legal right to review the

entirety of the video footage of the assault and the rest of the investigatory file, in direct

contravention of Colorado law. Denver's improper withholding of these public files has delayed

Mr. Smith's ability to seek justice. It has denied both Mr. Smith and the public their legal access

to video and records reflecting the misconduct of law enforcement officers. Indeed, were it not

for the cell phone video recorded by a stranger, Defendants' assault on Mr. Smith would not be

known to the public, Defendant Glasby would likely still be employed by the Denver Police

Department, and he almost certainly would not have faced criminal charges.

### B.    Defendant Glasby had a demonstrated history of using excessive force.

29.    Earlier in the night on June 12, 2023, Defendant Glasby used grossly excessive

force against another reveler in the Nuggets celebration crowd. Defendant Glasby grabbed a

woman who was involved in an altercation with another woman outside of Defendant Hayter's.

Instead of simply de-escalating the altercation and detaining the woman, Defendant Glasby

hooked his arm around the woman's neck from behind and slammed the woman to the ground by

her neck. This incident was likely not isolated and, upon information and belief, Defendant

Glasby routinely used excessive force while working for Defendant Hayter's and Defendant DPD.

30. Prior to June of 2023, during his less than five years on the force, Defendant Glasby faced multiple other complaints lodged against him with DPD's internal affairs unit by other citizens complaining that he used excessive force against them, too. On September 6, 2018, a citizen lodged a complaint that Defendant Glasby used excessive force. DPD summarily concluded on October 2, 2018 that the complaint was unfounded and imposed no discipline on Defendant Glasby. On June 5, 2020, another citizen complained about Defendant Glasby using excessive force. DPD again summarily concluded that the complaint was unfounded and imposed no discipline on Defendant Glasby. These complaints put Denver on notice that Defendant Glasby was customarily using excessive force in his interactions with citizens. Denver's failure to meaningfully address Defendant Glasby's actions demonstrates its deliberate indifference. It also communicated to Defendant Glasby that his customary use of excessive force was sanctioned by Defendant DPD.

C. **Defendant Denver has a custom and practice of its officers using excessive force, failing to discipline officers who use excessive force, and deficient training, supervision, and discipline when it comes to DPD officers' use of force.**

31. The Denver Department of Safety ("DOS") is a division of the City and County of Denver, and the Mayor of Denver appoints its executive director. DOS oversees both the DPD and the Denver Sheriff's Department ("DSD"). The Department of Safety, though its Director and its investigatory apparatus, condones, tolerates, and encourages the use of excessive force by its law enforcement officers in both the DPD and the DSD.

32. Denver law enforcement officers in both DOS branches have engaged in a persistent practice of misconduct, and the officials responsible for assuring that such misconduct

does not occur have consistently failed to properly train, supervise, and discipline individual officers who have engaged in such misconduct.

33.     The sheer volume of instances of excessive force by Denver law enforcement evidences the custom and practice of Denver law enforcement officers of using excessive force (and not being subject to appropriate discipline when they use excessive force), along with Defendant Denver's lack of training, supervision, and discipline of its law enforcement officers when it comes to excessive force. This is reflected in the numerous, among other things, (i) judicially-confirmed jury verdicts finding Fourth Amendment violations, (ii) legal settlements with Denver from claims of excessive force by law enforcement, (iii) lawsuits filed against Denver law enforcement, and (iv) the sheer number of different Denver law officers and officials involved (dozens) in those lawsuits and the recurrence of certain officers in multiple suits, reflecting the absence of consequences or reformation for the most inveterate perpetrators.

34.     Denver has routinely cleared officers of any wrongdoing, despite being forced to pay huge settlements and/or judgments to victims of such misconduct. Defendant Denver has turned a blind eye to DPD's persistent and extreme infliction of excessive force.

35.     Just last week, Denver taxpayers footed the bill for two separate settlements totaling half a million dollars, required by Denver officers' use of excessive force against civilians.

36.     According to his March 2023 lawsuit, Denver police officers and paramedics encountered Scott Peters on the afternoon of April 25, 2021, in a parking lot near Empower Field at Mile High. Officers found a bag of what they believed to be cocaine inside his car, and paramedics injected Peters with sedatives without his permission. After a stay at Denver Health, Peters was transported to the downtown jail. When attempting to move him from a wheelchair into

a cell, Denver deputies became needlessly aggressive, yanked Peters out of the chair and brutalized him inside the cell for nearly five minutes. One deputy, identified in the complaint as Daniel Rodriguez, used a pair of nunchucks to control Peters' right arm, and eventually applied enough force to break his wrist and sever two arteries. The injury required emergency surgery and left Peters with permanent damage. Denver City Council approved a settlement of $400,000 on June 5, 2024. *See Peters v. City and County of Denver, et al.*, Case No. 2023-cv-00750-RM-JPO (D. Colo.).

37.     On April 20, 2021 Lidya Ryans called Denver police for assistance in making sure her husband peacefully left the home. By the time officers arrived, Ms. Ryans let them know that she no longer required their assistance, but instead of leaving as she requested, Denver Police Officers Grisliet Blacno, Patrick Smith, and Christopher Brown entered her home without permission or a warrant, one officer punched her in the head, and two of the officers shoved her up against a wall and finally pushed her into a glass fixture that shattered on the floor. DPD officers then arrested Ryans and accused her of assaulting a law enforcement officer – a charge that was ultimately dismissed by the District Attorney. Denver Internal Affairs determined there was no misconduct for the inappropriate force allegations made against Cpl. Smith. Allegations of discourtesy for Officer Bernal-Blanco's foul language were handled as informal counseling. Denver City Council approved a settlement of Ms. Ryans' claims for $100,000 on June 5, 2024. *See Ryans v. Blanco*, *et al*., Denver District Court Case. No 2023CV31159.

38.     On August 22, 2018, DPD Sergeant Joseph Rodarte, along with three other officers employed by DPD and supervised by Rodarte, forcibly arrested Malow Mayek, an unarmed, 120 pound seventeen-year-old. Mr. Mayek was fleeing after ingesting some illegal drugs. Sergeant Rodarte struck Mr. Mayek six times with a metal baton, and his subordinate

DPD officers Douglass Watson and James Martinez each tased Mr. Mayek. Then, as another officer handcuffed Mr. Mayek's wrists behind his back as he writhed and shrieked on the pavement from his blunt force injuries, Sergeant Rodarte applied nun chucks as a vice on Mr. Mayek's right lower leg, repeatedly twisting and torquing the device while jerking Mr. Mayek's leg skyward. Mr. Mayek suffered a head injury, a fractured nose, and fractures of his right tibia and right fibula, coupled with facial lacerations requiring sutures above his right eyebrow. He was hospitalized for two days with life threatening injuries and required surgery to insert a rod into the cavity of his right tibia. Mr. Mayek brought a civil rights lawsuit against Denver claiming excessive force and Denver paid $1,200,000 to settle his claims.

39.     On January 1, 2019, DPD Officers Daniel Felkins and Robert Blanc viciously beat and tased Justin Lecheminant in his own backyard after he drove away from a traffic stop. The officers broke his nose, punctured his eardrum, broke multiple of his ribs, and inflicted a serious concussion on him. Mr. Lecheminant brought a lawsuit with claims of excessive force and Denver paid $450,000 to settle those claims.

40.     On January 26, 2017, DPD officers pulled over Kristyn Stonkas as she parked in the alley behind her home. When Ms. Stonkas and her partner, Quennel Steele, yelled at the officers, DPD officers responded by violently taking down, handcuffing, and beating the couple. DPD officers caused Ms. Stonkas a traumatic brain injury and a torn vertebrae in her neck, and caused Mr. Steele a traumatic brain injury, a collapsed lung, and a fractured rib. In 2019, Denver settled the couple's excessive force claims against Denver and its officers (before the couple filed a lawsuit) for $500,000.

41.     On June 3, 2016, DPD officer Greg Dulayev inflicted unreasonable and excessive force on Gregory Heard, an unarmed African American homeless man. DPD officer Dulayev

tased Mr. Heard and shoved his face into the dirt, even while Mr. Heard was unarmed and obviously complying with officer commands to surrender. After tasing and shoving Mr. Heard to the ground, Officer Dulayev, another Denver police officer present at the scene, and the Denver Investigating Supervisor, knowingly prepared false police reports in an overt effort to cover up Officer Dulayev's grossly excessive force. They thus falsely asserted that Mr. Heard was disobeying police commands, aggressively advancing towards and threatening the officers, when in fact he was doing nothing at the time besides complying with Officer Dulayev's instructions to come out from behind the bushes. After a sham investigation, the DPD and IAB determined that Officer Dulayev's conduct was consistent with policy and his training as a Denver Police Officer, and that Officer Dulayev had not violated the rights of Mr. Heard.

42. On November 11, 2015, multiple Denver Sheriff's deputies killed Michael Marshall at the Denver Downtown Detention Center. While Mr. Marshall was pacing around in a mental health emergency, multiple sheriff's deputies tackled and piled on top of Mr. Marshall, causing him to vomit and sending him into cardiac arrest. During this use of excessive force, the deputies shoved Mr. Marshall's face into a puddle of his own vomit, causing him to asphyxiate, and then placed a spit mask over his mouth. An autopsy showed that Mr. Marshall died from complications from positional asphyxia and suffered multiple blunt force injuries to his face, chest, back, and extremities. Ultimately, Denver paid $4,650,000 to settle Mr. Marshall's family's claims, along with agreeing to make some changes to the grossly deficient policies and practices at the Denver Downtown Detention Center. However, the deputies involved in Mr. Marshall's death received little to no punishment for their violation of Mr. Marshall's constitutional rights. One even received an award.

12

43.     On the morning of January 26, 2015, two Denver police officers shot and killed teenager Jessica Hernandez. At the time Ms. Hernandez was shot, she was in a vehicle that had been reported stolen with four other teens. None of the teens had weapons. In all, the officers fired eight shots, including four that went through the driver's side windows. In January, the Denver police department determined that officers did not violate any policies and they would not be disciplined. In April 2017, Denver paid $1,000,000, along with other nonmonetary consideration, to settle Ms. Hernandez's family's claims that the Denver police officers used excessive force.

44.     In July 2014, DPD Officer James Medina pinned Seryina Trujillo to the floor of her jail cell with his knee on her neck. Officer Medina was fired for his use of obviously excessive force, and in 2019, Denver settled Ms. Trujillo's excessive force lawsuit.

45.     Also in July 2014, Denver paid Jamal Hunter a $3.25 million settlement to resolve a case involving multiple instances of wrongdoing by Denver and DSD deputies. On July 18, 2011, Mr. Hunter was the victim of a fellow inmate's violent attack that was enabled by the complicity of Deputy Gaynel Rumer, who initially received a mere 40-day suspension. Part of Deputy Rumer's misconduct included failure to conduct proper rounds. Then, on July 31, 2011, Denver Deputy Edward Keller attacked and choked Mr. Hunter. Despite Mr. Hunter's having filed a grievance, Denver did not review the incident until after the initiation of his lawsuit. In connection with the Hunter litigation, United States District Court Judge Kane asked federal authorities in June 2014 to investigate the "patterns and practices" of the Denver police and sheriff's offices and suggested they were intimidating a key witness, saying that the Denver police investigation "smacks of a sham."

46. In September 2014, Denver Sheriff's Deputy Thomas Ford punched inmate Kyle Askin in the face multiple times while he was handcuffed. Denver fired the deputy, but he was reinstated by the civil service commission. Denver settled Mr. Askin's claims for $65,000.

47. In July 2014, Denver Police Officer Choice Johnson violently assaulted Brandon Schreiber at a bar in Denver. Officer Johnson tore both of Schreiber's rotator cuffs. Officer Johnson had a long history of using excessive force, including at least nine excessive force complaints filed against him. Denver settled Mr. Schreiber's claims for $185,000.

48. On May 22, 2012, Denver Police Officer Kyllion Chafin assaulted Philip White, a blind 77-year-old man, who was waiting for a bus at the Greyhound bus station in downtown Denver. Because Mr. White failed to leave the Greyhound station while waiting for his bus back to Vail, Officer Chafin slammed Mr. White's head into a ticket counter, causing a bloody gash on his head, and applied overly tight handcuffs to his wrists. Denver IAB found that Officer Chafin had neither violated department policy nor used excessive force in his interaction with Mr. White, despite significant evidence that Officer Chafin had used excessive force on a small, elderly blind man who had committed no crime. In October 2015, a federal jury returned a verdict against Officer Kyllion Chafin on Mr. White's excessive force claim, awarding Mr. White $100,000 in compensatory damages and an additional $300,000 in punitive damages, for a total verdict of $400,000. Denver paid that verdict plus several hundred thousand dollars in attorney fees, foregoing their right to appeal the jury verdict.

49. On January 12, 2011, Daniel Martinez, Jr., Nathan Martinez, Daniel Martinez III, and Jonathan Martinez (collectively, "the Martinez Family") filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Jason Valdez, Robert Martinez, Robert Motyka, and Bryce Jackson. The Martinez Family alleged that

the officers began pounding on their door shortly after 11:00 pm, demanding that they open the door. When Daniel Martinez, Jr. opened the door slightly, the officers rushed into the house without consent or a warrant. Officer Valdez slammed Jonathan Martinez's head through a window and then pulled him outside of the house and slammed him onto the concrete to apply handcuffs. Officer Martinez pushed Daniel Martinez into the living room, pinned him against the sofa, and applied handcuffs. Officer Motyka punched Nathan Martinez in the face without any provocation. Officer Jackson forcefully dragged Daniel Martinez III from the house and slammed him into the concrete before applying handcuffs. All of the Martinez Family members were criminally charged. A jury acquitted Nathan Martinez and Daniel Martinez III on all charges. All of the charges against Daniel Martinez, Jr. and Jonathan Martinez were dropped. The Martinez family was awarded $1,800,000 by a federal jury in September of 2014.

50.     On January 11, 2011, Alexander Landau sued Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Randy Murr, Ricky Nixon, and Tiffany Middleton. Mr. Landau alleged that he was assaulted during a traffic stop. Mr. Landau was driving with Addison Hunold when he was pulled over. Mr. Landau did not have his wallet, so he could not provide any identifying information to the officers. He exited the car as instructed. Mr. Hunold informed the officers that he had a small amount of marijuana and he was placed in handcuffs. The officers began searching Mr. Landau's car. When they tried to open the trunk, Mr. Landau asked if they had a warrant authorizing a search of the trunk. Two of the officers then grabbed each of Mr. Landau's arms, and a third officer punched him in the face with no provocation. One of the officers then yelled that Mr. Landau was going for a gun (though he was not). Denver officers continued to beat him in the face and head with their fists, a radio, and a flashlight. Denver police spewed racist epithets at Mr. Landau, who is Black. More officers arrived on the

scene and joined the assault. Officer Murr pointed his gun at Mr. Landau's head and threatened to shoot him. Paramedics arriving on the scene documented that Mr. Landau was found lying prone on the curbside, handcuffed behind his back, bleeding from the head, with lacerations and in acute distress. Mr. Landau was transported by ambulance to the hospital, where he was treated for a broken nose, lacerations, and serious closed head injuries, including a large hematoma, a concussion, and a hemorrhage in his right eye. Immediately after assaulting Mr. Landau, Denver police officers began the cover-up. They pressured an on-scene witness to sign a false statement and filed false reports about the incident. The IAB investigation into the officers' assault was conducted for the purpose of exonerating the officers involved. Ultimately, Denver did not discipline a single officer, either for lying or assaulting Mr. Landau. The case settled with Denver agreeing to pay Mr. Landau $795,000.

51.     On November 23, 2010, Jared Lunn filed a lawsuit against the City and County of Denver, Denver Police Officer Eric Sellers, and unknown Denver Police Officer John Doe. Mr. Lunn alleged that after he attempted to report an assault to Officer Sellers, which Officer Sellers ignored, Officer Sellers assaulted him. Mr. Lunn was attempting to get into his friend's vehicle when he muttered, "way to protect and serve," in response to Officer Sellers' refusal to take his assault report seriously. Officer Sellers then wrapped his arm around Mr. Lunn's neck to pull him out of the car. Officer Sellers placed Mr. Lunn in a carotid compression hold. After Mr. Lunn went limp, Officer Sellers kicked his legs out from under him and threw him to the ground. After handcuffing Mr. Lunn, Officer Sellers got within inches of Mr. Lunn's face and yelled homophobic epithets at him. Officers Sellers then released Mr. Lunn without citing him for violation of any law and allowed him to go home. In June 2011, Denver settled the case for $45,000.

52.     On September 20, 2010, Rohit Mukherjee filed a lawsuit against Denver Police Officer Abbegayle Dorn and two other DPD officers. Mr. Mukherjee alleged that Denver Police Officers knocked on his door while he was hosting a party in his apartment. One of the officers asked Mr. Mukherjee to step outside. When he refused, one of the officers pushed his way into the apartment and Officer Dorn pinned Mr. Mukherjee against the door and choked him. When Mr. Mukherjee informed the officers that he could not breathe, one of them threw him to the ground, face first. One of the officers stood on Mr. Mukherjee's ankle and rocked back and forth. Once Mr. Mukherjee was restrained, the officers pushed him face first on the carpeted floor, causing contusions to his face. Mr. Mukherjee's guests then began recording the use of excessive force with their cell phones, at which point Officer Dorn took the cell phones without permission and placed them in a bowl of water in the kitchen in order to destroy the photographic and video evidence of Denver's police misconduct. While Mr. Mukherjee was still restrained, the other officers stepped on and kneed Mr. Mukherjee's face and bent his fingers backwards as far as they could without breaking them. While escorting Mr. Mukherjee out of his apartment, the officers slammed his head into the hallways walls and the elevator wall. Mr. Mukherjee's injuries included jaw injuries, bruises, hand and knee pain, lacerations, knee contusion, hand sprain, and nerve damage. Denver settled the case in 2011 for an undisclosed amount of money.

53.     In August 2010, Denver paid Chad Forte $22,500 to settle a lawsuit resulting from Denver Police Officer Kenneth Johnson's use of excessive force. After Mr. Forte allegedly jaywalked, Officer Johnson followed him into his apartment building and jumped him from behind, causing him to suffer facial injuries.

54.     In July 2010, five Denver Sheriff Department deputies killed Marvin Booker, a homeless, African American street preacher, in the booking area of the Van Cise-Simonet

detention Center. Mr. Booker's family filed a civil rights lawsuit against the involved deputies in the United States District Court for the District of Colorado, captioned *Walton v. Gomez (In re Estate of Booker)*, Case no. 1:14-cv-02574-RBJ. After the deputies killed Mr. Booker, they and others within the DOS took numerous steps to cover up their crime. These steps included meeting together prior to speaking with investigators to coordinate their stories about Mr. Booker's death and hiding the taser used during the killing of Mr. Booker. After a three-week trial, a federal jury returned a verdict in October 2014 finding that all the deputy-defendants and their sergeant violated Mr. Booker's civil rights by subjecting him to excessive and ultimately fatal force. The jury determined that the Denver Deputies and their Sergeant killed Marvin Booker in a manner that was willful, intentional, and malicious. The largest part of the $4.65 million verdict ($4.5 million) was for punitive damages against the Denver Deputies and their Sergeant, calculated to punish these Denver defendants and to deter others from similar conduct in the future. Following the entry of a final judgment, and without appealing the jury verdict, Denver settled the case for $6,000,000.00. Even after the case settled, Denver continued to ratify the wrongdoing of all the defendants by insisting that everything done in the Jail with respect to Marvin Booker was standard operating procedure that fully complied with the law. Unsurprisingly, Denver never disciplined any of the *Booker* defendants. Importantly, Denver stipulated that the individual defendants' conduct in each of their interactions with Mr. Booker on July 9, 2010 was engaged in pursuant to the customs, policies, and practices of the City and County of Denver – and stipulated that a finding of liability on any of the plaintiffs' Section 1983 claims against any one (or more) of the individual defendants constituted a finding of liability against Denver as well.

55.     On July 1, 2010, Robert Duran filed a lawsuit against the City and County of Denver and Denver Sheriff's Deputy Steven Koehler. Mr. Duran alleged that, while he was waiting unescorted next to an elevator in the Denver County Jail as directed, Deputy Koehler approached him. Without warning or provocation, Deputy Koehler slammed Mr. Duran into the elevator wall. Deputy Koehler then dragged Mr. Duran approximately 10 feet down the hallway. While Mr. Duran was handcuffed, Deputy Koehler kicked him all over his body and face. Mr. Duran was taken to the hospital by ambulance. Mr. Duran's injuries included scalp lacerations, bruised ribs, chest contusions, and a closed head injury. Mr. Duran prevailed in a jury trial and was awarded $40,000 in compensatory damages for physical and mental injury plus prejudgment interest, and over $217,000 in attorney fees.

56.     In June 2010, Tyler Mustard filed a lawsuit against the City and County of Denver and Denver Police Officers Michael Morelock and Kimberly Thompson. Mr. Mustard alleged that Officer Morelock chased him on foot, tackled him to the ground, and beat him in the head, neck, and body. The Officers alleged that Mr. Mustard was spray painting a van and assaulted an officer; the criminal case against Mr. Mustard was dismissed. Denver agreed to settle the case for $117,000.

57.     In June 2010, John Crespin filed a lawsuit against the City and County of Denver and Denver Police Officers Steven Castro, Todd Allum, Eric Sellers, and Joey Gasca. According to the lawsuit and media accounts, the officers followed 17-year-old Crespin home after he witnessed them using excessive force on a group of kids. Witnesses saw the officers kick Crespin's legs out from under him, use a chokehold on him, cuff him, and beat him with police batons for 15-20 minutes. Denver settled the case in 2012 for an undisclosed amount of money.

58.     On March 19, 2010, James D. Moore filed a lawsuit against the City and County of Denver and Denver Police Officers Shawn Miller and John Robledo. Mr. Moore alleged that Officers Miller and Robledo arrived at his apartment complex in response to a 9-1-1 call from his neighbor reporting a noise coming from Mr. Moore's apartment. When the officers arrived, Mr. Moore and his girlfriend were standing outside of his apartment. After instructing Mr. Moore, whose hands were not in his pockets, to remove his hands from his pockets, the officers tackled Mr. Moore from behind and struck him on the head without provocation or warning. While he was on the ground, DPD officers beat Mr. Moore so brutally that he lost consciousness and his heart stopped. CPR had to be administered to save his life. DPD officers continued the beating even after Mr. Moore was restrained, despite his repeated insistence that the officers had "the wrong guy." Mr. Moore suffered debilitating injuries as a result of his assault. He had to undergo back surgery and months of physical rehabilitation, and was left walking with a cane and unable to stand up for more than ten minutes without having to sit or lie down due to pain. Denver paid Mr. Moore $860,000 to settle the case in May 2015.

59.     On March 16, 2010, Mark Ashford was walking his dogs when he witnessed Denver Police Officers pull over a driver for allegedly going through a stop sign. When Mr. Ashford informed the driver that he would be willing to testify that he saw the driver come to a complete stop, Denver officers focused on Mr. Ashford. When he began taking pictures of the scene, the officers attempted to wrestle the camera from Mr. Ashford, pushing, grabbing, and attempting to punch him to get him to the ground. To cover up their wrongdoing, Denver officer charged Mr. Ashford with interference and resistance, but the charges were later dismissed. Mr. Ashford was transported from the scene by ambulance. He subsequently filed an excessive force complaint with the DPD. In June 2011, Denver settled the case for $35,000.

60.     On December 29, 2009, Vicki Lynn Trujillo filed a lawsuit on behalf of the Estate of Jason Gomez against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officer Timothy Campbell. Ms. Trujillo alleged that Officer Campbell began pursuing Mr. Gomez without reasonable suspicion or probable cause. When Officer Campbell confronted Mr. Gomez, he ordered Mr. Gomez to kneel on the ground and pointed his gun at him. Officer Campbell repeatedly shouted that he was going to kill Mr. Gomez. When Mr. Gomez, who was unarmed, stood up and began running from Officer Campbell, Officer Campbell shot him in the back. The bullet perforated Mr. Gomez's spinal column. Officer Campbell then fired a second round of shots, hitting Mr. Gomez twice in the chest, once in the abdomen, once in the right thigh, and once in the left knee. Mr. Gomez died from multiple gunshot wounds. In December of 2012, Denver paid $190,000 to settle the case.

61.     On October 16, 2009, Wayne C. Rose filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald R. Whitman, Detective Mark S. Woodward, and unidentified John Doe Police Officers. Mr. Rose alleged that, while fleeing police unarmed, he was knocked to the ground by an officer on foot and then run over by an officer on a police motorcycle. The impact of the motorcycle knocked Mr. Rose unconscious, and Detective Woodward then handcuffed Mr. Rose's hands behind his back. Detective Woodward then picked Mr. Rose up by his arms and dropped him onto the pavement two or three times, causing his face and body to strike the pavement several times. Officer Woodward and the unidentified John Doe Officers then beat and kicked Mr. Rose repeatedly. Mr. Rose's injuries resulting from the officers' use of excessive force included a broken arm that required multiple surgeries. Denver settled the case for an unknown amount.

62.     In September 2009, Denver settled a wrongful death lawsuit for $225,000 to the family of Alberto Romero, who died after police repeatedly tased and beat him with impact weapons when he was arrested wearing only boxer shorts. Before he died, Mr. Romero suffered eight broken ribs and had his tongue split open from the use of excessive force.

63.     On August 10, 2009, Danvis Smith filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald Whitman, Denver Manager of Safety Alvin LaCabe, and Denver Police Officer Joseph P. Flynn. Mr. Smith alleged that he was involved in an altercation with Officer Flynn, who was working on foot in the Denver International Airport parking garage. Officer Flynn reached through the driver's side window and struck Mr. Smith in the mouth with his elbow. Officer Flynn then pulled Mr. Smith out of the car by his right arm and handcuffed Mr. Smith in an awkward position, with his arms lifted high in the air beyond the normal range of motion. Mr. Smith was charged with assault, but all charges against him were subsequently dropped. Mr. Smith's injuries included a torn rotator cuff, a torn biceps tendon, and chronic back pain. Denver settled the case for an unknown amount.

64.     On August 7, 2009, James B. Bouchard filed a lawsuit against the City and County of Denver and Denver Police Officers M. Whetstone and K. Jiminez. Mr. Bouchard alleged that the officers arrived at his house in response to a call by Mr. Bouchard's former girlfriend, who wanted to retrieve her personal belongings from his house. When Mr. Bouchard refused to allow the officers to enter his home without a warrant, the officers forced their way in and used a nightstick to restrain Mr. Bouchard in his own home. They then shoved him into a wall and handcuffed him. Mr. Bouchard's resulting injuries included a torn rotator cuff and bruises, contusions, and other injuries to his upper torso, face, and head. Denver settled the case before trial.

65.     On July 19, 2009, multiple Denver police officers assaulted four women outside of the Denver Diner. None of the women had committed, or were accused of committing, any crime and, in fact, the officers had been called because one of the women they ended up brutally assaulting was the victim of an assault in the diner's bathroom. Police maced all of the women, and further brutalized two of the women while they were handcuffed. After the incident, Denver initiated a cover-up of the brutality and excessive force by prosecuting the women. Upon information and belief, neither officer was disciplined. Certainly, neither officer was fired or criminally prosecuted. The City of Denver paid $360,000 to settle the claims.

66.     On June 30, 2009, James R. Watkins filed a lawsuit against the City and County of Denver and Denver Police Officers John Ruddy and Randy Penn. Mr. Watkins alleged that, when he noticed he was being followed by the officers, he reached for his cell phone while asking them if they were going to beat him up. The officers responded by lunging toward Mr. Watkins and hitting him in the face with their closed fists and elbows. They continued beating him after he was on the ground and under police control. Mr. Watkins had to be taken by ambulance to Denver Health Medical Center because he was bleeding profusely as a result of the officers' use of excessive force. He was initially charged with Assault in the Second Degree, but all charges against him were dropped. Denver paid Mr. Watkins $20,000 to settle the lawsuit.

67.     On June 30, 2009, Michael DeHerrera filed a lawsuit against the City and County of Denver and Denver Police Officers Devin Sparks, A. Jaramillo, and R. Murr. Mr. DeHerrera alleged that, while he was using his cell phone to inform his father (a Pueblo police officer) that the Denver Police Officers were assaulting his friend, the officers assaulted him. Officer Sparks used an arm bar takedown to force Mr. DeHerrera face first onto the sidewalk. Once Mr. DeHerrera was on the ground, Officer Sparks used a sap impact weapon repeatedly on Mr.

DeHerrera's body, and other officers struck him in the face multiple times. Mr. DeHerrera had to be taken to the hospital by ambulance, and his injuries included head trauma and facial contusions. This incident was captured on video. Despite the aggravated circumstances, the officers were only very lightly disciplined. Since the case received considerable publicity and public protest, the DPD reopened an internal affairs investigation into the incident, which resulted in a $17,500 settlement. Although Officers Sparks and Murr were briefly terminated by the then Manager of Safety based upon their excessive force and falsification of official reports, Denver decided to reinstate both of them as officers.

68.     On June 30, 2009, Shawn Kyeone Johnson filed a lawsuit against the City and County of Denver and Denver Police Officers Devin Sparks, A. Jaramillo, and R. Murr. Mr. Johnson was involved in the altercation with Denver Police that resulted in Mr. DeHerrera's lawsuit. Mr. Johnson alleged that, as he was being assaulted by a club bouncer, three Denver Police Officers joined in the assault, striking him in the face with elbows and closed fists even after he was under police control. Mr. Johnson suffered severe injuries, including head trauma and facial contusions, and was taken by ambulance to the hospital. In August 2010, Denver settled the case for $15,500.

69.     On May 15, 2009, Altagracia Medina Valencia filed a lawsuit on behalf of her deceased husband against the City and County of Denver, Denver Police Chief Gerry Whitman, and eight unknown John Doe Denver Police Officers. Ms. Valencia alleged that, while her husband, Odiceo Valencia-Lopez, was attending his daughter's communion, he suffered a self-inflicted knife wound to the wrist. When his family called for an ambulance, the call was routed to Denver Police. Mr. Valencia-Lopez was standing by his vehicle with the knife in his hand when he was surrounded by six to eight officers with their weapons drawn. The officers ordered

Mr. Valencia-Lopez to drop the knife, but due to his lack of understanding of English, blood loss, and intoxication, he did not understand their commands. An officer then tased Mr. Valencia-Lopez, causing him to drop the knife. After Mr. Valencia-Lopez was tased and dropped the knife, the other officers began shooting him. Denver officers shot him approximately seven times, in front of his entire family. He died at the scene. Denver settled the case for an unknown amount.

70.     On May 4, 2009, Jason Anthony Graber filed a lawsuit against the City and County of Denver and Denver Police Officers Miller, Davis, and two other unknown John Doe Officers. Mr. Graber alleged that, as he was crossing the 16th Street Mall at Market Street, a police officer in a marked car yelled out his window, "dumbass!" The police car then pulled up next to Mr. Graber, his brother, and his wife, and asked if they needed assistance. Mr. Graber responded that they did not need assistance, but that he did not appreciate being called a dumbass. The officers then exited their vehicle and one of them tackled Mr. Graber from behind. Denver officers grabbed him by the neck and kicked his legs out from under him. He fell down, slamming his knee and elbow onto the concrete. Mr. Graber was arrested for public intoxication, but a breathalyzer test showed a blood alcohol content of 0.036, well below the legal limit, and he was released. X-rays to Mr. Graber's leg showed lipohemarthrosis and a possible hairline fracture. Mr. Graber remained in a leg brace for many months after the incident. United States District Court Judge Kane determined that Denver had improperly impeded appropriate discovery in this case by refusing to produce documents regarding previous uses of force by Denver law enforcement personnel. Denver settled the case for $225,000 in 2011. See *Graber v. City and County of Denver*, No. 09-cv-01029-JLK-MJW, 2011 U.S. Dist. LEXIS 82226 (July 27,

2011); *Graber v. City and County of Denver*, No. 09-cv-01029-JLK-MJW, 2011 U.S. Dist. LEXIS 99594 (Sept. 6, 2011).

71.    On April 30, 2009, John Stephen Heaney filed a lawsuit against the City and County of Denver and Denver Police Officers James Costigan, Michael Cordova, Noel Ikeda, Luke Palmitere, and Daniel Steele. Mr. Heaney alleged that, while he was riding his bicycle near Coors Field on opening day of the baseball season, he was attacked by undercover police officers, who did not identify themselves as law enforcement agents. Denver officers put him into a chokehold and forcibly brought him to the ground, where they punched him in the head repeatedly. One of the officers grabbed him by the hair and slammed his face into the pavement, breaking two of his teeth. As a result of the excessive force used against him, Mr. Heaney also suffered severe bruising on his hands, knees, arms, and legs, as well as other injuries requiring surgery. Denver settled the case.

72.    In January 2009, Denver paid $100,000 to Trudy Trout to settle a lawsuit that arose out of Denver Police Officer Nicholas Rocco-McKee's use of excessive force. Officer Rocco-McKee shoved Ms. Trout to the ground, causing her to break her wrist. Despite the fact that the encounter was caught on video, Officer Rocco-McKee lied on his report, stating that Ms. Trout tripped over her own high heeled shoes, which she was not wearing. Denver did not discipline Officer Rocco-McKee for the use of force or for lying on his report.

73.    In 2008, Denver paid $885,000 to settle a lawsuit brought in response to an incident in which Denver Police Officers Charles Porter, Luis Rivera, and Cameron Moerman used excessive force against Juan Vasquez, a 16-year-old boy. Mr. Vasquez was severely injured with a lacerated liver and broken ribs after one of the officers used a fence as leverage to jump up and down on the boy's back while he lay prone on the pavement.

74.     On June 12, 2007, Ross Edward Smith filed a lawsuit against the City and County of Denver and Denver Police Officers Jarrod Tinnin and Mark Sutton. Mr. Smith alleged that while he was walking down the 16th Street Mall as part of a protest against the Iraq war, he was approached by Officer Tinnin. Officer Tinnin had dismounted his motorcycle and walked up to Mr. Smith and punched him in the face with a closed fist, throwing him to the pavement. Officer Sutton then joined Officer Tinnin in tackling and beating Mr. Smith. Officer Tinnin pushed Mr. Smith's face into the pavement while Officer Sutton kneeled on Mr. Smith. Denver officers charged Mr. Smith with interference, but all charges against him were dropped. As a result of the excessive force used against him, Mr. Smith suffered injuries and abrasions to his face, arms, hands, neck, and back, and aggravation of his Parkinson's Disease, causing severe and uncontrollable tremors. Denver settled the case for an unknown amount.

75.     On August 11, 2006, Chandler Lyles filed a lawsuit against the City and County of Denver and Denver Police Officer Ryan Burke. Mr. Lyles alleged that Officer Burke came to his home to investigate a claim that Mr. Lyles's mother was suicidal. Officer Burke ordered Mr. Lyles to sit on a sofa in the living room, and Mr. Lyles complied. Then, without provocation or warning, Officer Burke tackled Mr. Lyles, forcing him to the ground and handcuffing him. As a result of the excessive force used by Officer Burke, Mr. Lyles suffered injuries that included a broken right clavicle. Denver settled the case for an unknown amount.

76.     On April 3, 2006, Hirut Berhanmeskel filed a lawsuit against the City and County of Denver and Denver Police Officer Gilberto Romero. Ms. Berhanmeskel alleged that, while she was attempting to resolve a parking ticket dispute at the Denver Parking Ticket Referee's office, she was approached by Officer Romero. Officer Romero, apparently upset that Ms. Berhanmeskel was crying about her inability to resolve her parking ticket issue, grabbed Ms.

Berhanmeskel's arm violently and roughly twisted it behind her back. He slammed her against the wall and handcuffed her without even warning her that he was placing her under arrest. Ms. Berhanmeskel suffered a broken wrist as a result of the excessive force used by Officer Romero. Denver settled the case for an unknown amount.

77.     On January 6, 2006, Francisco Juan Lobato, Anthony Lobato, Barbara Lobato, and Ramona Lobato filed a lawsuit on behalf of the estate of Frank Lobato against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Ranjan Ford, Jr., Joshua Herrick, Gene Sharla, Robert Shiller, Charles Kyle, Steven Addison, and unidentified John and Jane Doe Officers. The Lobatos alleged that the Defendant Officers entered the Lobato home without a warrant looking for a suspect. Frank Lobato was sleeping in his bed at the time the officers entered the home and was unarmed. When the officers were unable to locate the suspect, they entered Mr. Lobato's bedroom and shot and killed him. Denver paid $900,000 in 2007 to settle the lawsuit.

78.     On November 21, 2005, David Nettles filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Carlette Havard, Michael Nuanes, Jr., Damian Naranjo, and Zachary Phillips. Mr. Nettles alleged that the officers, while responding to a domestic violence call across the street from Mr. Nettles's house, decided to apprehend Mr. Nettles. In effectuating the unlawful arrest of Mr. Nettles, one of the officers began punching him in the ribs, while another used nunchucks on Mr. Nettles' ankle, causing him to fall to the ground. While Mr. Nettles was on the ground, another officer kicked him in the head at least three times. One or more officers jumped onto Mr. Nettles' back, yelling, "when we give you an order, you obey it!" Another officer began punching Mr. Nettles in the back of the head, yelling, "you did it to your own damn self!" While the officers were attempting to handcuff

Mr. Nettles' hands behind his back, he heard his shoulder snap. After he was handcuffed, the officers continued hitting him in the head and kicking him in the back. Mr. Nettles' injuries included a severe shoulder injury and bruising to his ribs, arms, left elbow, and knees. Denver settled the case for an unknown amount.

79.     On August 5, 2005, Quincy Michael Shannon filed a lawsuit against the City and County of Denver, Denver Mayor John Hickenlooper, and Denver Police Officers Thomas McKibben and Chan Thanong. Mr. Shannon alleged that, while he and three friends were waiting in their car in a parking lot, they were approached by an officer who told them they could wait five more minutes for their friends to come out of a nightclub, and then they would have to move their car. Another officer then approached the car and told them to move. The driver attempted to move the car, but the parking lot was full of cars. A third officer then approached the car and sprayed mace or pepper spray into the driver's face. The driver tried again to move the car but was unable to. Another officer then approached and sprayed the other occupants of the car with mace or pepper spray. All of the passengers then exited the car, which was filling up with fumes from the spray. Mr. Shannon asked Officer McKibben how they were supposed to move the vehicle when the parking lot was full, and in response Officer McKibben sprayed him in the face again. Mr. Shannon then walked away and dialed 911 to report the incident. Officer McKibben overheard Mr. Shannon describing him on the phone and sprayed him again. When Mr. Shannon turned away, Officer McKibben grabbed Mr. Shannon's arm and bent it behind him. Officer McKibben then kicked Mr. Shannon's feet out from under him and shoved his face into the pavement. Officer McKibben then grabbed both of Mr. Shannon's arms and one leg, handcuffing his hands behind his back over his ankle. Officers McKibben and Officer Thanong then picked Mr. Shannon up and sprayed him in the face again. Mr. Shannon

suffered cuts and scrapes to his face, resulting in a permanent scar. Denver settled the case for an unknown amount.

80.     In 2004, Denver paid the family of Paul Childs $1.32 million to settle a lawsuit brought after Denver Police Officer James Turney shot and killed Paul, a developmentally disabled 15-year-old boy. Officer Turney responded to a 911 call from Mr. Childs' sister, and when he arrived at the house, Mr. Childs was holding a knife. When Mr. Childs refused to drop the knife, Officer Turney shot and killed him. Two other officers were in the house with non-lethal tasers, which were not used. Mr. Childs' mother informed officers that he was a "special needs" child, but they nonetheless shot him from the front door while he was standing in the hallway.

81.     On December 6, 2004, Richard Rra-Shada filed a lawsuit against the City and County of Denver, Denver Police Officers Dennis Bedenbender and Shanna Michael, and Robert A. Kaser. Mr. Rra-Shada alleged that Officer Bedenbender struck him with his police vehicle. When Mr. Rra-Shada responded with a profanity, Officer Bedenbender got out of his police vehicle, approached Mr. Rra-Shada, and clipped his legs from underneath him, causing him to fall head-first onto the pavement. Officer Michael then hit Mr. Rra-Shada with her nightstick and kicked him repeatedly in his torso. At the same time, Officer Bedenbender was punching Mr. Rra-Shada in the head with closed fists. Mr. Rra-Shada's injuries included head and brain trauma, as well as injuries to his shoulder, wrist, back, ribcage, and abdomen. He also began suffering seizures after the incident. Denver settled the case for an unknown amount.

82.     On February 25, 2004, Regina Keith filed a lawsuit on behalf of the estate of Gregory Lee Smith, Jr. against the City and County of Denver, Denver Police Chief Gerald Whitman, Denver Police Officers Robert Silvas and Jim Turney, and unknown John Doe

Officers. Ms. Keith, Mr. Smith's mother, alleged that the officers arrived at her home after she called 911 for assistance with a domestic dispute. When they arrived, Mr. Smith was in his bedroom. Mr. Smith then exited his bedroom with a three-inch utility knife. The officers ordered him to drop the knife, and when he didn't, they fatally shot him. The individual officers settled the case for an unknown amount.

83.     Also in 2004, Denver paid Terrill Johnson $75,000 to settle a lawsuit against the City, Denver Police Chief Gerald Whitman, and Denver Police Officers Troy Ortega, Louis A. Estrada, Perry Speelman, Richard Eberharter, Randy Yoder, and Danny Perez. Mr. Johnson alleged that as he was driving home from his job at Denver International Airport, he noticed he was being followed closely by a Denver Police patrol car. The officers in the car followed him to his residence. He went into his home, and when he went back outside to take out the garbage, the officers, still in their patrol car, were shining a spotlight into his car, which he had parked in front of the house. As the officers reversed the patrol car, they slammed into Mr. Johnson's wife's car. Mr. Johnson approached his wife's car to inspect the damage, and the officers exited the patrol car with their weapons drawn. They instructed Mr. Johnson, who was not armed, to throw down his weapon. Additional officers arrived at the scene, continuing to instruct Mr. Johnson to drop his weapon. He removed his shirt and raised his hands into the air to show the officers that he was not armed. The officers then rushed toward Mr. Johnson, slammed him onto a patrol car, punched him, forcibly subdued him while handcuffing him, and threw him into the patrol car, using racial slurs the entire time. Mr. Johnson was charged with two minor traffic offenses and interference; all charges against him were dropped.

**D.**     <u>**Multiple courts have determined that Denver improperly trains, supervises, and disciplines its officers regarding the use of force.**</u>

84.     This District Court's proceedings in *Ortega, et al. v. City and County of Denver*, et al., 944 F. Supp. 2d 1033 (D. Colo. 2013), reflect Defendant Denver's longstanding unconstitutional training, supervision, and discipline with respect to excessive force. In *Ortega*, the four plaintiffs demonstrated that Denver had used excessive force against them as a result of three discrete theories: (i) Denver's inadequate training of DPD officers on use of force, (ii) Denver's failure to adequately investigate complaints of DPD officers' excessive force and discipline officers who used excessive force, and (iii) Denver's custom of tolerating DPD officers' "code of silence" with respect to uses of force. The plentiful evidence presented in *Ortega* included the following: (i) testimony by Denver's former Manager of Safety, Charlie Garcia, that, dating back to 1993, DPD officers had used "heavy-handed tactics" that were a result of the DPD's training policy; (ii) testimony by Denver's former Independent Monitor, Richard Rosenthal, that Denver had a "systemic problem" of officers not being held accountable for their uses of force; (iii) evidence of numerous specific instances in which DPD's Internal Affairs Bureau failed to adequately investigate citizen complaints of excessive force and Denver failed to adequately discipline the implicated officers; and (iv) testimony by former Manager of Safety Garcia that he had observed a pattern of DPD officers' failure to report uses of force. Ultimately, United States District Court Judge William J. Martinez allowed the plaintiffs' excessive force claims against Denver to proceed to a jury given the overwhelming evidence that Denver failed to appropriately train, supervise, and discipline its officers when it came to uses of force.

85.     As recently as July 13, 2020, in an excessive force case, United States District Court Judge John Kane denied Denver's motion to dismiss a *Monell* claim, holding that it is a question of fact whether Denver trains and supervises or disciplines its officers sufficiently and

predictably so that they understand what they can and cannot do when using force. *See Talley v. City and County of Denver, et.al.*, Civil Action No. 16-cv-02327-JLK.

E.   **Denver, through DPD officers, has a custom and practice of indiscriminately using excessive force in a crowd control setting.**

86.   In May 2010, Denver settled a lawsuit filed by Eric Winfield for $40,000. Mr. Winfield alleged that he was severely beaten by Denver Police Officers Antonio Milow, Thomas Johnston, and Glen Martin while he was making his way through LoDo crowds after a 2007 World Series game. Mr. Winfield's injuries included chipped teeth, permanent scars, and nerve damage in his hands.

87.   On October 29, 2011, Denver police officers responded to a peaceful protest by using indiscriminate force against the crowd. Denver police officers used excessive force against those gathered by firing projectiles at them. After the October 29, 2011, incident, the ACLU of Colorado sent Denver a letter outlining the concerns associated with its officers' use of indiscriminate and excessive force. Despite being notified of these grossly excessive uses of force and the widespread nature of it, Denver did not provide further training to its officers or discipline any officer involved. Denver's ratification of DPD officers' indiscriminate use of force signaled to DPD officers that such force was consistent with Denver's customs, policies, practices, and training, and that DPD officers can use excessive force in crowd control settings without any risk of discipline. Predictably, they have continued to do so.

88.   Throughout the George Floyd protests in the summer of 2020, DPD officers used grossly excessive and indiscriminate force against those who had gathered in downtown Denver. Some examples of the excessive force used by officers are outlined below. These examples demonstrate a custom and practice of DPD officers using excessive force in a crowd control setting. A large number of the incidents outlined below resulted in lawsuits, or at least internal

affairs complaints, against the officers involved and Denver itself. These lawsuits and internal affairs complaints placed Denver on notice of the ongoing custom and practice of DPD officers of using excessive force in crowd control settings. Despite this, Denver has done next to nothing to curb this custom and practice, as outlined further below.

89. On May 28, 2020, DPD officers used excessive force against Michael Acker while he was participating in a demonstration relating to the murder of George Floyd. Mr. Acker, a young Black college student, was peacefully protesting in a march from the Capitol building to I-25. There, he watched from the pedestrian bridge as other protesters marched onto I-25. DPD officers formed a police line on the west side of Platte Street near the pedestrian bridge. At this point, without any warning whatsoever, DPD officers began shooting pepper balls at the protesters, including Mr. Acker. Mr. Acker put on a gas mask and ran to help a woman who was being brutally pelted with pepper balls from a range of approximately fifteen feet. He continued acting as a medic to other protesters suffering the effects of the chemical agents unleashed by DPD until the group began retreating and Mr. Acker followed. As he was retreating, Mr. Acker raised his fist in the air. Immediately, and with no warning, one DPD officer fired a Kinetic Impact Projectile ("KIP") at Mr. Acker's head, striking him in his right eye. It shattered the glass eye piece in his gas mask. He feared he would lose his eye. Had he not been wearing a gas mask, he likely would have. One of the officers on-scene yelled at Mr. Acker, after he had been shot in the eye, "motherfucker, that's what you get, fuck you." Mr. Acker received 12 stitches to close wounds on his forehead, nose, and upper eyelid, and doctors had to remove pieces of glass and debris from his eye. Over a month after the injury, Mr. Acker continued to experience foggy vision, light sensitivity, inability to read, and difficulty tracking movement in his right eye. No DPD officer was disciplined for their actions toward Mr. Acker. Denver settled Mr. Acker's claims for $500,000.

90.     On May 28, 2020, DPD officers used excessive force against Hyoung Chang, a credentialed press photographer for *The Denver Post* who was gathered in Denver to cover the protests in the aftermath of George Floyd's murder. Law enforcement personnel struck Mr. Chang two times with pepper-ball rounds. One round cut Chang's arm. The other shattered his press badge that was hanging around his neck. Mr. Chang was quoted after the event as saying, "If it was one shot, I can say it was an accident. I'm very sure it was the same guy twice. I'm very sure he pointed at me*."*

91.     On May 29, 2020, DPD officers used excessive force against Gabriel Thorn who was gathered in downtown Denver in the aftermath of the murder of George Floyd by police officers. Officers shot Mr. Thorn in the head with a KIP. While at the protest, Mr. Thorn served at times as a medic. Mr. Thorn is a veteran who served in the Armed Forces. Mr. Thorn also wore a red cross on his helmet and backpack to indicate that he was a medic there to treat those injured. Several times while treating injured people, DPD officers targeted him and shot pepper balls. He witnessed DPD officers utilize rubber bullets, tear gas, flash-bang grenades, and pepper balls. Officers attacked protesters indiscriminately with these ordinances and without regard for civilian safety. Mr. Thorn also observed DPD officers aiming at bodies and heads when firing rubber bullets. Having served in the military and been trained to use rubber bullets, Mr. Thorn was struck that these officers had not been trained to use them correctly. His training in the military made clear that these bullets were to be aimed at the ground and never directly at people, even in war zones. During the protest, officers struck Mr. Thorn with pepper balls, rubber bullets, and tear gassed multiple times. Officers struck Mr. Thorn with rubber bullets in the head, as they also did to many others. Fortunately, he was wearing a helmet at that time, so the strike did not cause major damage. Denver did not discipline the DPD officers who used excessive force against Mr. Thorn.

92.     On May 29, 2020, DPD officers used excessive force against Andy Sannier who happened to be downtown during the protests that erupted in Denver after the murder of George Floyd. One DPD officer shot Andy Sannier in the chest with a KIP without warning. Mr. Sannier was walking home downtown that evening, when he saw a Black man yelling at (but not threatening) officers. A white couple started arguing with the Black man who was yelling at the officers. Mr. Sannier stopped and recorded this with his cell phone from a comfortable distance. DPD officers opened fire on the people arguing, and, seeing that Mr. Sannier was filming, shot him in the chest with a pepper ball. Denver did not discipline the DPD officers who used excessive force against Mr. Sannier.

93.     On May 29, 2020, DPD officers used grossly excessive force against Megan Matthews while she participated in the demonstrations in downtown Denver driven by the murder of George Floyd by police officers. DPD officers shot Megan Matthews in the head with a KIP as Ms. Matthews was standing alone and not engaged in any violence or property destruction. When hit with the KIP, she immediately blacked out. When she woke up, her face was covered in blood. A friend then carried Ms. Matthews to a grassy area near the State Capitol, where she was bandaged by a doctor and later loaded into an ambulance. Ms. Matthews filed a lawsuit claiming excessive force against Denver and Denver settled her claims for $575,000. Denver did not discipline the DPD officers who used excessive force against Ms. Matthews.

94.     On May 30, 2020, DPD officers used excessive force against Jeremy Jojola, an on-air correspondent for KUSA-TV/9News who was covering the George Floyd protests in downtown Denver. DPD officers shot Mr. Jojola with a less-lethal projectile round while he was standing beside a professional cameraman from that station. Denver did not discipline the DPD officers who used excessive force against Mr. Jojola.

95.     On May 30, 2020, DPD officers used excessive force against Lindsay Fendt, a freelance reporter and photographer who was covering the George Floyd protests in downtown Denver. Ms. Fendt was standing in a group of press photographers taking photos when a DPD officer kicked a pepper gas canister directly into her face. Denver did not discipline the DPD officer who used excessive force against Ms. Fendt.

96.     On May 30, 2020, DPD officers used excessive force against Michael McDaniel, who was one of the thousands gathered in downtown Denver in remembrance of the life of George Floyd. DPD officers shot Mr. McDaniel in the head with KIPs without warning. Mr. McDaniel attended the protest rally on Saturday afternoon to serve as a medic to attend to those injured by the police. At one point, DPD officers tear-gassed a parking lot on the corner of Colfax and Lincoln. The tear gas was so thick that it could barely be seen through. Mr. McDaniel saw a protester crawling out on his hands and knees. The protester was choking and could not breathe. Mr. McDaniel, with his back to the police, kneeled down to treat the protester, who was still on all fours. The police then proceeded to target and shoot Mr. McDaniel and the protester with pepper bullets. They shot Mr. McDaniel in the head with these projectiles. Thankfully, Mr. McDaniel was wearing a helmet, so when the police aimed at his head, they did not cause a serious injury, other than the intense burning pain that Mr. McDaniel experienced as a result of the pepper balls. Denver did not discipline the DPD officers who used excessive force against Mr. McDaniel.

97.     On May 30, 2020, DPD officers used excessive force against Lindsay Minter, who helped to organize and lead a peaceful march in response to the video of the brutal police murder of George Floyd that had been released a few days earlier. On the morning of May 30, 2020, Ms. Minter headed to downtown Denver to help lead a protest against the DPD and other

law enforcement. Ms. Minter parked her car just north of the Capitol and walked toward the Capitol grounds. When she arrived at the Capitol grounds, she met with Colorado State Representative Leslie Herod and Denver Public Schools Director Auon'tai Anderson. Ms. Minter arrived at the Capitol and met with Representative Herod and Director Anderson around noon. After arriving at the Capitol, Ms. Minter, along with Representative Herod and Director Anderson, helped lead others who had gathered on a march throughout downtown Denver that eventually made its way to a rally at the Capitol. At the end of the rally at the Capitol, Ms. Minter addressed the crowd. She gave a speech and led the crowd in the Assata chant. Ms. Minter then left the Capitol grounds and walked north toward her car to drive home. As she walked, Ms. Minter witnessed DPD officers in riot gear, standing both on the street and on the back of a Rapid Deployment Vehicle ("RDV"), confront a group of individuals who were continuing to march through Denver. Ms. Minter noticed that these individuals were simply attempting to march down the street when the DPD officers blocked their way in an effort to prevent them from marching. The protesters were calm and chanting at the officers, "Why are you in riot gear? We don't see no riot here." Shortly after noting the presence of the officers and the marchers, Ms. Minter witnessed a DPD officer throw a Sting Ball grenade directly next to her while other DPD officers shot projectiles indiscriminately at and near Ms. Minter. DPD officers hit Ms. Minter in the face with a projectile. The impact shocked Ms. Minter and she immediately grabbed her face. There was no basis for Denver officers to throw the Sting Ball grenade at Ms. Minter or to shoot at her with projectiles. At no point during her time in Denver on May 30, 2020, did Ms. Minter violate any law, engage in any activity that could be perceived as threatening law enforcement officers or others, resist arrest in any way, or damage any property in any way. When Ms. Minter was hit, she was simply walking back to her car after the march.

She, like countless others who Denver officers hit with projectiles and seriously injured during the George Floyd protests, was simply gathered in downtown Denver when she was shot. Denver did not discipline the DPD officers who used force against Ms. Minter.

98.     On May 30, 2020, DPD officers used excessive force against Elisabeth Epps. DPD officers shot Ms. Epps with rubber bullets during a peaceful protest in front of the Capitol, after tear gassing and pepper-spraying the crowd without warning. A rubber bullet hit her face, breaking the plastic medical-grade respirator mask she was wearing and wounding her face. After a three-week trial, a federal jury awarded $1,000,000 to Ms. Epps, with $250,000 of the verdict awarded based on its determination that a DPD officer used force against her in retaliation for her free speech activity maliciously and/or in reckless disregard of her federally protected rights. Denver did not discipline the DPD officer who used force against Ms. Epps.

99.     On May 30, 2020, DPD officers used excessive force against Jax Feldmann. DPD officers shot Mr. Feldmann in the eye with a KIP without warning. Mr. Feldmann was walking at about 9:30 p.m. from his friend's apartment at Grant Street and Colfax Avenue to his car parked a block away on Sherman Street. Mr. Feldmann wasn't protesting when a law enforcement officer riding on the back of a DPD truck fired a projectile at his face without warning and blinded him in one eye. There were no large groups of protesters nearby when DPD officers shot Mr. Feldmann, and no one near him yelled at or threw anything at the DPD officers on the truck, which was marked with the DPD logo. Alone in the hospital, Mr. Feldman was told by doctors that they would have to perform emergency surgery to save his eye, but even though doctors performed that surgery, Mr. Feldmann will never regain his full vision. Mr. Feldmann filed a lawsuit against Denver and its officers for excessive force and Denver settled that lawsuit for $2,300,000. Denver did not discipline the DPD officer who used force against Mr. Feldmann.

100.    On May 30, 2020, DPD officers used excessive force against the son of former Major League Baseball star Dale Murphy. DPD officers shot Mr. Murphy's son in the eye with a KIP without warning while he was gathered with others in downtown Denver to protest the murder of George Floyd by police officers. Denver did not discipline the DPD officer who used force against Mr. Murphy's son.

101.    On May 30, 2020, DPD officers used excessive force against Russell Strong. DPD officers, without warning, shot Mr. Strong in the head with a KIP while he was protesting near Civic Center Park and carrying a sign that read "No justice, No peace." The force of the KIP knocked him out. As a result of this use of force, Mr. Strong required several facial reconstructive surgeries to repair broken bones around his eye and to realign the right side of his jaw. Mr. Strong lost his right eye because of the use of force by DPD officers. Denver did not discipline the DPD officer who used force against Mr. Strong.

102.    On Saturday, May 30, 2020, DPD officers used excessive force against Stanford Smith. DPD officers, without warning, sprayed Stanford Smith in the face with pepper-spray for no identifiable reason. Mr. Smith, like many others, had gathered to protest the murder of George Floyd by the police in downtown Denver. About five minutes after Mr. Smith arrived, officers dressed in riot gear standing near a DPD surveillance truck shot cannisters of tear gas into the crowd. Officers did not offer a warning before firing the tear gas. Because of the effect of the tear gas, Mr. Smith left the immediate area. At about 7 p.m., Mr. Smith was standing with a group of protesters near Civic Center Park. Mr. Smith became fearful as officers formed a single file line and encircled the area, standing shoulder to shoulder. Some protesters threw near-empty plastic water bottles in the direction of the line of officers. Out of concern that the situation would escalate and to protect the people residing in a nearby homeless encampment, Mr. Smith

began telling protesters to stop throwing items at police. He ushered protesters toward the sidewalk, to get them away from the line of officers, and he told officers that he only wanted to protest peacefully. One Black officer thanked Mr. Smith for trying to keep the peace. As Mr. Smith was talking to protesters, one officer got out of his place in line, pushed his way between two other officers in the line, and sprayed Mr. Smith directly in his face with pepper spray. The officer did not give any warning before spraying the pepper spray in his face. Mr. Smith feared for his life: he could not see, and he felt as though his face was on fire. Mr. Smith's face remained red for several days, and his skin eventually peeled. Mr. Smith took his claims for excessive force to trial against Denver, and a jury found that Denver violated his rights and awarded him $1,000,000. Denver did not discipline a single DPD officer for what they did to Mr. Smith.

103.     On May 30, 2020, DPD officers used excessive force against Darrell Hampton. Mr. Hampton was peacefully protesting and filming DPD officers on the sidewalk near the Capitol in the afternoon. A number of DPD officers were standing on the back of a DPD pickup truck, carrying pepper ball guns. As the truck was driving away, one officer decided to randomly shoot Mr. Hampton in the face with a pepper ball for no apparent reason. There was no violence or property destruction happening; Mr. Hampton was simply standing on the sidewalk filming the protest and the officers. Mr. Hampton filed a lawsuit against Denver for excessive force and Denver eventually settled his claims for $175,000. Denver did not discipline the DPD officer for shooting Mr. Hampton.

104.     DPD officers used excessive force against Mercii Thomas on May 30, 2020. Ms. Thomas was attending the George Floyd protests in downtown Denver when DPD officers shot her in the head with a KIP as she was walking away from DPD officers with her hands up. The KIP

knocked Ms. Thomas unconscious. When she came to, she was lying on the ground and bleeding. Even while she lay on the ground unconscious, DPD officers continued to pelt her with pepperballs. Ms. Thomas required stitches to close the wound in her head and continues to suffer the effects of the brain injury caused by the gratuitous and excessive use of force against her by DPD officers. Ms. Thomas filed a lawsuit alleging excessive force and Denver ultimately settled her claims for $500,000. Denver did not discipline any DPD officer for their abuse of Ms. Thomas.

105.   DPD officers used excessive force against Eric Weber on May 30, 2020. Mr. Weber attended the peaceful Denver protest for Black lives with the intention of exercising his First Amendment rights, but instead was confronted with what would turn out to be a hallmark of the Denver protests: escalation, intimidation, and the excessive use of force by the DPD. Mr. Weber had heard that the DPD was using overwhelming violence against the peaceful protesters, so he came to the protest wearing a leather motorcycle jacket and gas mask. He did so to protect himself and in hopes that if DPD again used unnecessary violence, he could protect others who may not have the same access to protective gear. At approximately 5 p.m. on May 30, 2020, Mr. Weber was standing with other protesters near the Colorado State Capitol building. He was holding a sign that was critical of police violence and white supremacy. Without warning, and while he was merely standing peacefully holding a sign above his head, a DPD officer shot Mr. Weber in the chest, under his arm, with a KIP. This caused Mr. Weber extreme pain. Within minutes shooting him in the chest with a KIP, DPD also shot Mr. Weber in the leg with pepper balls and submerged him in a cloud of tear gas. Mr. Weber suffered serious bruising and pronounced pain in his chest for over a week after DPD's use of excessive force; he also suffered painful burning from the pepper balls and tear gas. Mr. Weber filed a lawsuit alleging excessive force and Denver ultimately

settled his claims for $135,000. Denver did not discipline any DPD officer for their treatment of Mr. Weber.

106.    On May 31, 2020, DPD officers used excessive force against Robert Dayton. Mr. Dayton joined the protests in downtown Denver after seeing the George Floyd protests in Denver covered on the news and hearing explosions from his apartment. Mr. Dayton went to observe the protests in the evening. Mr. Dayton wished to get an unbiased, firsthand look at the way police were responding to the protesters. When Mr. Dayton arrived at the protests, which were happening on Colfax Avenue, he saw that DPD officers aggressively advancing on the protesters and indiscriminately shooting at them with KIPs, including 40mm rounds and pepper balls. Mr. Dayton did not observe the protesters engaging in any unlawful behavior. There was no property destruction or aggression against the police by protesters. Mr. Dayton was shocked to see DPD officers using force against peaceful protesters, so he decided to join the protesters to express his belief that this violent reaction by the police was wrong. After Mr. Dayton joined the crowd of protesters, DPD officers continued to indiscriminately shoot pepper balls and other KIPs into the crowd. DPD officers hit Mr. Dayton multiple times with pepper balls, even though he was not engaging in any property destruction, committing any crime, threatening any law enforcement officer (or anyone else), or attempting to flee arrest. Prior to shooting, DPD officers never issued a warning of any kind that pepper balls would be deployed or that Mr. Dayton, specifically, should cease engaging in any conduct or risk being shot with pepper balls. After being shot with pepper balls, Mr. Dayton sat down in pain to demonstrate that he was not being aggressive in any way towards the DPD officers in front of him or the community surrounding him, even as the officers continued their aggression toward Mr. Dayton and his fellow protesters. As Mr. Dayton was sitting down, DPD officers again began advancing on the crowd. The DPD officers began,

again, deploying KIPs indiscriminately into the crowd. They issued no announcement or warning prior to deploying the KIPs. Mr. Dayton noticed that others around him were turning around to disperse from the aggressively advancing officers. Seconds after DPD officers began advancing on the crowd of peaceful protesters, one of DPD officer threw a flash-bang grenade directly at Mr. Dayton, who was still sitting in the middle of the crowd. The flash-bang grenade struck Mr. Dayton directly in his left elbow, then exploded, searing Mr. Dayton's eyes and causing him significant pain in his elbow. Prior to deploying the flash-bang grenade, the DPD officers never issued a warning that a flash-bang grenade would be deployed. When Mr. Dayton was hit with the flash-bang grenade, he was not engaging in any property destruction, committing any crime, threatening any law enforcement officer (or anyone else), or attempting to flee arrest. Because of DPD's actions, Mr. Dayton suffered numerous damages. He endured enormous pain in his elbow. For a while, Mr. Dayton was limited in his ability to work and needed to work odd intermittent hours to keep up with his full-time job due to his difficulty typing with his left arm. Mr. Dayton filed a lawsuit against Denver for excessive force and Denver eventually settled his claims for $225,000. Denver did not discipline any DPD officer for their treatment of Mr. Dayton.

107.    On May 31, 2020, DPD officers used excessive force against Gabe Schlough. Mr. Slough, an individual with a degree in public health anthropology who some had medical training and had participated in protests before, attended the protests near the state Capitol with the intention of being there help anyone who was injured by the DPD officers. When Mr. Slough arrived, he saw a crowd of two or three hundred people facing down a line of police. They were standing just a little bit more than shoulder to shoulder apart with full riot gear, with their face shields and full protective armor on. Mr. Slough, sensing a conflict, moved up toward the front

of the crowd and began to tell people who didn't have eye coverings to watch their eyes and protect their faces. DPD officers then shot a woman in the chest with a tear gas canister right next to Mr. Slough. Mr. Slough bent down to help the woman and, while doing so, covered the tear gas canister with a cone. As soon as he did this, officers shot Mr. Slough in the face and chest with KIPs. Mr. Slough described the sensation as getting his with a baseball bat. He helped the woman back away from the line of DPD officers and, as he did so, the other individuals he had attended the protest with told him that his chin was falling off. The KIP had left a gaping wound on his chin, and blood was pouring down onto the front of his shirt. Mr. Slough went to the hospital where he required 22 stitches to close the wound on his chin. He still experiences pain from this wound and required plastic surgery for it to heal properly. Mr. Schlough filed a lawsuit against Denver for excessive force and Denver eventually settled his claims for $575,000. Denver did not discipline any DPD officer for their treatment of Mr. Schlough.

108.    On May 31, 2020, DPD officers used excessive force against Zachary Packard. Mr. Packard arrived at the protests on the streets surrounding the Capitol in the evening. When he arrived, DPD officers formed lines on two perpendicular streets and began closing in on the groups of protesters. DPD officers then started firing tear gas. Mr. Packard attempted to kick one tear gas canister away from the group of protesters near him. As he stepped off the sidewalk, DPD shot Mr. Packard in the head with a projectile. He was immediately knocked unconscious. DPD officers did not issue a warning before shooting Mr. Packard in the ear. Bystanders carried Mr. Packard from the sidewalk over into a patch of grass. When he returned to consciousness, a friend took him to the hospital. A CAT scan later revealed that Mr. Packard suffered a fractured skull and jaw, two fractured discs, and bleeding in his brain. Mr. Packard remained at the hospital for about one week. A jury found that Denver violated Mr. Packard's Fourth

Amendment rights, and awarded Mr. Packard $3,500,000 after a three-week trial. Denver did not discipline any DPD officer for their treatment of Mr. Packard.

109.    On May 31, 2020, DPD officers used excessive force against Youssef Amghar. Well before curfew, Mx. Amghar was with other peaceful protesters on the corner of Colfax and Lincoln. Protesters were chanting, "Hands up, don't shoot," and holding signs. Mx. Amghar was standing on the sidewalk. There was a line of DPD officers on Colfax. Mx. Amghar stood there with their hands up. Someone else not near them in the crowd threw a water bottle at the officers. The DPD officers immediately began shooting into the crowd with pepper balls. They did this without warning or giving any orders. At first, the DPD officers shot indiscriminately into the crowd, but after the crowd moved back, they began shooting directly at Mx. Amghar, even though they were standing still with their hands up. The DPD officers first shot them in the arms and legs, then in the chest, and then directly in the face, even though they continued standing still with their hands up. The DPD officers shot them approximately 14 times. The DPD officers did not give any orders before, during, or after this incident. No one told Mx. Amghar to move back or gave them any other orders. Mx. Amghar was so upset at the DPD officers' use of force on them that they began yelling words to the effect of, "I'm a goddamn U.S. Marine, what are you doing?" Mx. Amghar filed a lawsuit for excessive force against Denver and settled his claims for $250,000. No DPD officer was ever disciplined for their actions related to Mx. Amghar.

110.    On May 31, 2020, DPD officers used excessive force against Alex Burness, Mr. Burness was a journalist with *The Denver Post* who was covering the protests. He was fired upon, without warning, by law enforcement and shot in the head and abdomen with KIPs. DPD officers fired at Mr. Burness just after he yelled out "PRESS." He sustained a contusion on his head and right abdomen. No DPD officer was ever disciplined for their actions related to Mr. Burness.

111.     On May 31, 2020, DPD officers used excessive force against Darian Tindall. DPD officer shot Ms. Tindall in the chest with a pepper ball while marching on Colfax Avenue. Her hands were up above her head when she was shot, and she didn't see the projectile coming or anticipate the intense pain. She was given no warning by DPD. Denver did not discipline any DPD officer for their treatment of Ms. Tindall.

112.     On May 31, 2020, DPD officers used excessive force against Trevor Hughes. Mr. Hughes was photographing and recording the protests near Colfax and Emerson at approximately 8:30 p.m. While recording, with the camera near his face, DPD officers shot Mr. Hughes in the hand with a KIP. The shot broke and partially severed Mr. Hughes's right ring finger, leaving it dangling. Mr. Hughes immediately left the protest and went to urgent care. Mr. Hughes had to have his finger surgically repaired. Mr. Hughes filed a lawsuit and Denver eventually settled his claims for $485,000. Denver did not discipline any DPD officer for their treatment of Mr. Hughes.

113.     On June 1, 2020, DPD officers used excessive force against Ambrose Cruz. As a photographer and freelance journalist, Mr. Cruz attended the protests in downtown Denver to document them. In the evening, he was with protesters in front of the Capitol. The protesters were chanting peacefully. There were over one hundred people present. There was a line of DPD officers present on all sides of the protesters, surrounding them. Sometime after 9:00 p.m., DPD officers moved in and began rapidly shooting tear gas and foam bullets at the protesters. They did not give any warning or orders. Because the police had surrounded the protesters on all sides, it was difficult for protesters to escape. Mr. Cruz ran away from the gas. At approximately 13th Avenue, he saw a man in an electric wheelchair who had by struck by Police. As hard as he tried, Mr. Cruz was unable to move the extremely heavy wheelchair while he was being engulfed by

tear gas. Mr. Cruz ran towards the library. Around 13th Avenue, the DPD officers were shooting at him and protesters with tear gas and pepper balls. There were a lot of people who were trying to leave to go home. There were approximately 35 people at that corner, and they were all younger protesters, including teenagers. Almost all of them were Black. One protestor was having a seizure. Mr. Cruz and others tried to help him. Some people tried to leave, but DPD officers cornered them and shot pepper balls at them. A white person went up to the DPD officers to ask if they could leave because people wanted to go home. The DPD officer said that they could go home, and so people started walking towards where the officer told them to go. That officer started firing on people and everyone started running. Mr. Cruz ran with other protesters to a building and garage at 13th Avenue and Lincoln. The DPD officers ran after them. The DPD officers were shooting the protesters with pepper balls. They did not give any orders or warnings. Mr. Cruz and others ran down to the garage but discovered that armored vehicles blocked off both ends of the block and there was no exit. Cruz ran up the stairs, and as he looked up, a DPD Officer shot him in the face with pepper balls. The DPD officer hit him three times in the eye area and knocked his glasses off. A female DPD officer told him, "If you don't fucking get on the ground, I'm going to fucking kill you," or words to that effect. Even though Mr. Cruz stopped and was on the ground, the other DPD officer continued firing pepper balls at him, including at the back of his head. The DPD officer who had been repeatedly firing pepper balls at Mr. Cruz at close range taunted him, saying things like, "What happened to you? It looks like your wife beat you. I'd say that was two days old, this must have happened another night." Mr. Cruz's eye was bleeding, swollen shut, and bruised. He could not open his eye. A month after the attack, he still had light sensitivity and other problems with his eyesight. Mr. Cruz filed a lawsuit

related to Denver's actions; his case survived Denver's multiple attempts to dismiss it and is set for trial.  Denver did not discipline any DPD officer for their treatment of Mr. Cruz.

114.    DPD officers used excessive force against Amanda Blasingame and Maya Rothstein on multiple occasions during the George Floyd protests. At about 8 p.m. on May 28, 2020, Ms. Blasingame and Ms. Rothlein were gathered in a crowd of protesters outside of a police station near the Capitol. They were there to exercise their First Amendment right to protest and to stand in solidarity with those demonstrating against police violence. Though they witnessed some protesters throw things at the building, they did not observe any protesters throw anything at officers. As police marched from the station parking lot into the street, they released tear gas and shot rubber bullets into the crowd. Officers did not issue any warnings prior to using these tactics. Later that night, at about 9:30 p.m., a large group was chanting in the street. After one individual threw a single plastic water bottle toward the police, officers tear gassed the entire crowd and continued using tear gas to move the group up the street. On May 30, 2020 at about 5:30 p.m., Ms. Blasingame was gathered in a large crowd outside of the Colorado State Capitol building. Ms. Blasingame, along with the rest of the crowd, was on her knees chanting "Hands up! Don't Shoot!" As soon as the crowd stood from a kneeling position, officers began shooting tear gas and pepper bullets at the crowd without giving any warning.  Ms. Blasingame returned home to comply with the 8 p.m. curfew. She and Ms. Rothlein gathered in their front yard with some neighbors. When a police car followed by a line of SWAT vehicles drove down their street, one neighbor yelled at the police car. The police car and the SWAT vehicles stopped and the officers exited their vehicles. While the officers in SWAT gear stood in the street holding weapons, one officer came up to Ms. Blasingame and Ms. Rothlein's fence and began threatening to pepper spray them while they sat on the steps of their own home. While holding

the pepper spray up and pointing it at them, the officer stared directly at Ms. Rothlein, who was the only Black person in the front yard. Only after Ms. Blasingame reminded the officer of their First Amendment rights did the officer leave. Later that night, a SWAT vehicle drove down the street in front of Ms. Blasingame and Ms. Rothlein's home. Someone again shouted at the SWAT vehicle to leave their neighborhood. From the SWAT vehicle, officers shot pepper bullets directly at Ms. Blasingame and Ms. Rothlein where they were sitting on the front steps of their apartment. Pepper bullets hit the front door and even entered the apartment building. Ms. Blasingame and Ms. Rothlein retreated to the mail room of their apartment complex out of mortal fear only to find the mail room filled with gas. They could not enter the mail room for several days thereafter. Another pepper bullet hit one of Ms. Blasingame and Ms. Rothlein's neighbors, who was coughing and vomiting for over an hour after being hit. Ms. Blasingame and Ms. Rothlein sued Denver for a violation of their Constitutional rights and eventually went to trial on their claims. A federal jury found that Denver violated Ms. Blasingame's and Ms. Rothlein's Fourth Amendment rights and awarded them $1,000,000 each. Denver did not discipline any DPD officer for their treatment of Ms. Blasingame or Ms. Rothlein.

115.    DPD officers used excessive force against Ashlee Wedgeworth on multiple occasions during the George Floyd protests. Ms. Wedgeworth participated peacefully in protests in Denver every day from May 28, 2020 through June 4, 2020, and witnessed Officers in Denver exerting excessive force on several days she attended. She attended protests to stand in solidarity with those demonstrating against police violence and to exercise her own First Amendment rights. On the evening of May 29, 2020, Ms. Wedgeworth and a friend arrived near the Colorado state Capitol building to participate in the protest. Ms. Wedgeworth observed some individuals, who were standing far away from Ms. Wedgeworth, throw something in the direction of officers.

In response, officers began shooting projectiles at those individuals, but then also turned and shot at Ms. Wedgeworth (who is Black) and her friend with pepper balls. The pepper balls hit Ms. Wedgeworth's friend, and the resulting dust rendered Ms. Wedgeworth unable to breathe. Ms. Wedgeworth and her friend were not standing anywhere near the individuals who had thrown the objects. Officers did not offer a warning prior to shooting. On May 31, 2020, Ms. Wedgeworth was marching with a crowd of protesters on the streets surrounding the Capitol. The protesters were chanting and marching. Some protesters at the front of the march were laying down in the street, like George Floyd, but none were throwing items or being violent. Without issuing any warning, officers deployed tear gas. Due to the tear gas, Ms. Wedgeworth's face, eyes, nose, and mouth felt like they were burning; she could not see; and she was coughing a lot. On the evening of June 1, 2020, when Ms. Wedgeworth was protesting at the Capitol, officers formed a line in front of the Capitol and began pushing crowds into the street. Ms. Wedgeworth felt as though officers were trying to corral all of the protesters into one area. Then, once the protesters were corralled, officers released tear gas without warning. Ms. Wedgeworth again could not see, she was coughing, and her face felt like it was burning. Ms. Wedgeworth attended the protests again on June 2, 2020. That night, officers again released tear gas into the crowd of protesters. Ms. Wedgeworth also witnessed officers shoot projectiles that appeared to be pepper balls at protesters. As a result of the tear gas and pepper ball dust Ms. Wedgeworth inhaled on May 29, May 31, June 1, and June 2, 2020, Ms. Wedgeworth suffered pain and difficulty breathing, as well as burning in her nose, eyes, and on her face for a few hours after being gassed. Ms. Wedgeworth sued Denver for its violation of her constitutional rights. After a three-week trial, a federal jury found that Denver violated Ms. Wedgeworth's Fourth Amendment rights, and

awarded her $750,000. Denver did not discipline any DPD officer for their treatment of Ms. Wedgeworth.

116.     DPD officers used excessive force Hollis Lyman on multiple occasions during the George Floyd protests. On May 28, 2020, at about 8:30 p.m., Ms. Lyman arrived at the area of the State Capitol to exercise her First Amendment right to protest and to stand in solidarity with those demonstrating against police violence. She joined a crowd of protestors by the Capitol but was quickly pushed down a street near the Capitol by Officers. Officers tear gassed the entire crowd and Ms. Lyman felt like the tear gas was everywhere around her. Her eyes watered, and she coughed and gagged several times. Ms. Lyman did not hear officers issue a warning before releasing the tear gas. On May 29, 2020, protesters had gathered near the Capitol and were kneeling in front of police chanting "Hands up! Don't shoot!" Ms. Lyman observed police cars drive through the group and release tear gas and pepper balls from the vehicles. Ms. Lyman's eyes began to burn, and she ran away from the group to rinse her eyes with milk. Later, after returning to the protest, she used her sign as a shield to protect her from pepper balls. One pepper ball pierced through the sign, hitting Ms. Lyman and bruising her arm. On March 30, 2020, Ms. Lyman heard protest organizers encouraging peaceful protests. At about 3:30 p.m., Ms. Lyman observed officers shooting pepper balls at a man who was kneeling in front of the officers with his arms raised. Later, officers shot more pepper balls as well as grenades at protesters. One grenade hit Ms. Lyman's friend in the leg and made a deafeningly loud sound. Ms. Lyman became disoriented from the sound. Ms. Lyman and her friend had difficulty hearing for the rest of the night. Ms. Lyman also observed officers pull a boy's goggles and mask off of his face before spraying him in the face with pepper spray. Because Ms. Lyman desired to protect the people of color who were attempting to protest, Ms. Lyman returned to the protest area on

Saturday night, at times placing herself between the police and people of color who were protesting. As Ms. Lyman and a friend were walking toward a group of protestors at the Capitol that night, Officers in Denver routed them through a particular street. Ms. Lyman and her friend complied with the directions, but Officers shot Ms. Lyman in the back repeatedly with pepper balls anyway, as she tried to protect her friend. She struggled with gagging and nausea after inhaling gas and, after she returned home that night, Ms. Lyman threw up. Ms. Lyman sued Denver for its violation of her constitutional rights. After a three-week trial, a federal jury found that Denver violated Ms. Lyman's First and Fourth Amendment rights and awarded her $1,000,000. Denver did not discipline any DPD officer for their treatment of Ms. Lyman.

117.    DPD officers used excessive force against Kelsey Taylor on multiple occasions during the George Floyd protests. On May 28, 2020, Ms. Taylor marched with protestors in the downtown area and north towards I-25. After the protestors got off the highway, over one hundred protestors headed back towards the Capitol. Standing with over one hundred protesters around Platte and the pedestrian bridge near Confluence Park, Ms. Taylor heard one DPD officer say something to the effect of, "If anyone moves, light 'em up." DPD officers began shooting pepper balls at the protestors without warning or any orders. Many people were injured. Ms. Taylor marched back to the Capitol with other protestors. At 14th Avenue and Sherman, there was a line of DPD officers on 14th Avenue. Ms. Taylor and the other protestors stayed there about another hour, chanting, "Hands up, don't shoot," and "I can't breathe." Another group of protestors walked down 14th Avenue and joined Ms. Taylor's group of protestors. There were approximately two hundred people. At some point, the DPD officers tear gassed the entire crowd, without provocation. Ms. Taylor did not see anyone throw anything or get aggressive with the police. DPD officers gave no warning or orders. Ms. Taylor inhaled tear gas, which

caused breathing and vision problems. On May 30, 2020, Ms. Taylor went to the Capitol at around 5:00 or 6:00 p.m. to protest. She stood with other peaceful protestors on 14th Avenue in front of the Capitol building. Any time there was the slightest agitation in the crowd, even if it was non-violent, the DPD officers started shooting pepper balls and throwing tear gas without giving any warnings or orders. The DPD officers also shot into the crowd whenever protestors walked forward closer to Colfax. DPD officers hit Ms. Taylor with pepper balls, which caused bruises. She also inhaled tear gas. After curfew, at 14th Avenue and Broadway by the public library, Ms. Taylor was with approximately one hundred other demonstrators protesting the curfew itself. Ms. Taylor and the other demonstrators knelt in the intersection of 14th Avenue and Broadway. The DPD officers formed a line. They were in full riot gear and had batons and/or truncheons. They advanced towards the protestors. Even as Ms. Taylor and the others remained kneeling, DPS began jabbing people, including Ms. Taylor, with batons. Ms. Taylor saw a DPD officer hit a Black man across his chest with his baton. Ms. Taylor said words to the effect of, "You can't do that, he's not hurting you, he's unarmed." Another DPD officer grabbed Ms. Taylor's arm and told her that she was under arrest. Ms. Taylor heard another officer say, "Get me three more." Ms. Taylor sued Denver for its violation of her constitutional rights. After a three-week trial, a federal jury found that Denver violated Ms. Taylor's First and Fourth Amendment rights and awarded her $1,000,000. Denver did not discipline any DPD officer for their treatment of Ms. Taylor.

118.     DPD officers used excessive force against Sara Fitouri and Jacquelyn Parkins on multiple occasions during the George Floyd protests. On or around 5:00 p.m. on May 28, 2020, Ms. Parkins went to the Capitol building and participated in the protests. When some of the protestors began marching north, Ms. Fitouri joined Ms. Parkins as Ms. Parkins marched with

them through Confluence Park toward I-25 in a peaceful protest. On or around 7:00 p.m., they observed the DPD officers fire dozens of pepper balls on the group of protestors on the highway. At that time, Ms. Fitouri and Ms. Parkins were on a pedestrian walkway over I-25, where they inhaled pepper spray from the pepper balls. When they rejoined the march heading back downtown, they inhaled tear gas and/or pepper spray that DPD officers had used on protestors in that area. On or around 1:00 p.m. on May 29, 2020, Ms. Fitouri and Ms. Parkins arrived at or near the Capitol to join the protest and march. They marched with the other protestors to several locations, including the City and County Building and the jail. At approximately 8:00 p.m., Ms. Fitouri, Ms. Parkins, and other protestors were at the intersection of Colfax and Broadway. The group was peaceful. Someone in the group may have lofted a water bottle into the air. Rather than investigate and isolate that person, DPD officers indiscriminately opened fire with tear gas and pepper balls at the entire group of protestors, including Ms. Fitouri and Ms. Parkins, without warning or order to disperse. Once the initial pepper spray rounds were fired, the DPD officers continued to use pepper balls, tear gas, and flash-bang grenades on the protestors, including Ms. Fitouri and Ms. Parkins, from the corner of Broadway and Colfax, as well as multiple other locations on and around the Capitol. At one point, the DPD officers used pepper balls, tear gas, and flash-bang grenades to push protestors southeast of the Capitol into the surrounding neighborhoods. Ms. Fitouri and Ms. Parkins, along with another group of protestors, inhaled significant amounts of pepper spray and tear gas during this offensive move. Ms. Fitouri and Ms. Parkins saw many injured protestors at this time, including one woman who was unable to see or breathe and was caught in the gas. The DPD officers did not close any of the streets and their actions pushed protestors into active oncoming traffic. Ms. Fitouri and Ms. Parkins left the protest on or around 10:30 p.m., after experiencing significant exposure to tear gas fired by DPD

officers very close to their persons. DPD officers used pepper balls, teargas, and flash-bang grenades on protestors consistently throughout the evening and were still using pepper balls, tear gas, and flash-bang grenades at the time Ms. Fitouri and Ms. Parkins left. The DPD officers used pepper balls, tear gas, and flash-bang grenades across Colfax Avenue while the street was filled with traffic waiting at the red light, hitting or landing near the cars of drivers with no ability to escape the unprovoked onslaught. On the evening of May 29, 2020, Ms. Fitouri and Ms. Parkins also observed that DPD officers indiscriminately shot tear gas and/or pepper balls at the entire group of protestors anytime protestors moved within approximately fifteen feet of the officers. DPD officers never gave any warnings or dispersal orders before shooting tear gas and/or pepper balls at protestors. DPD officers shot tear gas and/or pepper balls at peaceful protestors who were kneeling on many occasions. Many of these protestors had their hands in the air and their shirts off. At many points in the evening of May 29, 2020, when Ms. Fitouri and Ms. Parkins and other peaceful protestors were on the Capitol steps with their hands up, chanting "Hands up, don't shoot," DPD officers fired flash-bang grenades, tear gas, and pepper balls into the crowd indiscriminately and without warning or orders. On the evening of May 30, 2020, Ms. Parkins saw DPD officers hanging off the sides of police trucks and shooting at protestors as fast as they could. On or around 4:00 p.m., Ms. Fitouri and Ms. Parkins arrived at the Capitol building for the evening protests prior to the start of curfew. They began at the west steps of the Capitol building. Before curfew that day, a DPD officer on Colfax north of the protestors threw a flash-bang grenade into the crowd, which exploded at Ms. Fitouri's foot. Ms. Fitouri's foot went numb and she suffered minor burns. The DPD officers had also shot tear gas, flash-bang grenades, and/or pepper spray into the crowd of protestors without warning or dispersal orders. A friend of Ms. Fitouri's and Ms. Parkins's was very badly gassed. Denver issued no warning about

enforcement of the curfew. Instead, at 8:00 p.m., DPD officers came out of the Capitol building and launched tear gas, flash-bang grenades, and/or pepper spray at the protestors, including Ms. Fitouri and Ms. Parkins, indiscriminately and without warning or dispersal orders. Ms. Fitouri and Ms. Parkins then marched with a group of protestors. Southeast of the Capitol, DPD officers began shooting pepper balls at the protestors without warning or giving any dispersal or other orders. Ms. Fitouri and Ms. Parkins were with a group of approximately 30 people who ran into an alley in order to avoid being hit. DPD officers chased the protestors both on foot and on SWAT vehicles into the alley in order to trap them and continue shooting at them. DPD officers hit Ms. Fitouri with pepper balls. Eventually, Ms. Fitouri and Ms. Parkins were able to get to their cars to leave. At the time that Ms. Fitouri and Ms. Parkins were present in public places in Denver after curfew on May 30, 2020, the DPD officers "enforced" the curfew against them and other protestors by shooting pepper balls or throwing tear gas at them and/or chasing them into alleys in order to use "less-lethal" weapons on them. The DPD officers did not give any warnings or dispersal orders and appeared only interested in intimidating and punishing protestors with their "less-lethal" weapons. After they left the protest, Ms. Fitouri and Ms. Parkins returned to their place of work at 15th Avenue and Grant Street where their cars were parked, in order to go home. A group of protestors came by. Suddenly, one or more police vehicles screeched to a halt, many DPD officers got out of their vehicles and began shooting pepper balls and/or tear gas at the protestors without warning or dispersal orders. Ms. Fitouri and Ms. Parkins attempted to hide behind their own vehicles. The DPD officers shot at them and other protestors running through the parking lot from approximately 20 feet away. On May 31, 2020, in the early evening, Ms. Fitouri and Ms. Parkins met at the Capitol to join the protest, which was peaceful. They marched with the other protestors. After the 8:00 p.m. curfew, when

Ms. Fitouri and Ms. Parkins and the protestors marched by the police precinct on Washington and Colfax, DPD officers intentionally allowed half the group to pass and then began tear gassing, flash-banging, and pepper spraying the middle of the protest march. There were likely several thousand protestors in the march at this time. DPD officers hit one of their friends three times with tear gas canisters, once in his head, once in his back, and once in his hand. He was seriously injured and immediately left to seek treatment at a nearby hospital. At one point on that evening, Ms. Fitouri and Ms. Parkins were near the Basilica at 15th Avenue and Grant Street with at least one hundred other protestors. DPD officers kettled the protestors. Indiscriminately and without warning or orders, DPD officers shot tear gas, flash-bang grenades, and pepper balls into the crowd from every direction. It was difficult for protestors to escape. On days when they attended protests in Denver and during the events described above, Ms. Fitouri and Ms. Parkins experienced tear gas and/or pepper spray on numerous occasions, as described above, which caused coughing, difficulty breathing, irritation and burning in the eyes, nose, throat, and mouth and a burning sensation on the skin. Ms. Fitouri and Ms. Taylor sued Denver for its violation of their constitutional rights. After a three-week trial, a federal jury found that Denver violated their First and Fourth Amendment rights and awarded them $1,000,000 each. Denver did not discipline any DPD officer for their treatment of Ms. Fitouri or Ms. Taylor.

119.    In the midst of the George Floyd protests, United States District Court Judge R. Brooke Jackson held that Denver's actions violated the Constitution and that Denver's officers were customarily using excessive force in this crowd control setting. On Thursday, June 4, 2020, four persons who had participated in the Denver protests since they began sued Denver, alleging that DPD officers' use of "less-lethal" weapons violated the First and Fourth Amendments. After a hearing on the matter, Judge Jackson issued a temporary restraining order restricting DPD from

using "less-lethal" projectiles and chemical agents on peaceful protesters. *See Abay v. City of Denver*, 445 F. Supp. 3d 1286 (D. Colo. 2020). In response to the evidence presented, Judge Jackson was unequivocal in his condemnation of the behavior of DPD officers toward those who gathered downtown, calling it "disgusting." Judge Jackson went on to conclude that there was a "strong likelihood" that DPD officers had engaged in excessive force in violation of the Fourth Amendment. Judge Jackson made this determination based on video evidence that showed "police conduct at the demonstrations" where "the officers had ample time for reflection and were not dealing with dangerous conditions" yet still "attacked [protesters] with rubber bullets, tear gas, etc." Judge Jackson found it particularly problematic that "officers specifically aimed at heads and groins, causing broken facial bones and ruptured testicles."

120.    After the George Floyd protests, Denver ratified DPD officers' use of grossly excessive force during the protests. On the morning of May 29, 2020, Police Chief Pazen and Mayor Michael Hancock held a press conference where they praised and explicitly condoned DPD officers' actions during the first two days of the George Floyd protests. Chief Pazen and Mayor Hancock stated, at least a half dozen times, that their observations were that the DPD officers had used "restraint" during their response to the first two days of the protests, despite there being large amounts of evidence that DPD officers had systematically used excessive force against protesters. Such official statements from the Mayor and the Chief of Police confirmed that the conduct of the DPD officers as described herein were pursuant to and consistent with the City's official policies, training, customs and practices.

121.    Ultimately, the George Floyd protests spawned at least one hundred and eleven complaints that DPD officers violated the constitutional rights of protesters and bystanders by using excessive force. Of the one hundred and eleven internal affairs investigations opened by

DPD as a result of the George Floyd protests, only three cases resulted in discipline for officers. Denver's widespread decision to condone the actions of DPD officers during the protests led to Defendant Glasby believing that he could use force with impunity (and no fear of discipline from Denver) in a crowd control setting.

122.    After the George Floyd protests, Denver has continued to condone its officers' use of excessive force in crowd control settings. For example, on July, 29, 2020, Michael Jacobs went to a protest at Lincoln Park related to the city clearing out an encampment of unhoused individuals. He decided to go because he had heard about accusations of police using force on others at the protest throughout the day, and wanted to show support. He was beside a chain-link fence set up around the park when police officers threw him to the ground without any verbal commands. One officer punched Jacobs in the face several times, and another used a baton to ram Jacobs in the genital area. Denver never disciplined the DPD officers who used excessive force against Mr. Jacobs. Mr. Jacobs filed a lawsuit against the officers for using excessive force and Denver settled his claims for $350,000.

**F.    Testimony from Denver's own officials after the George Floyd protests reveals that Denver abjectly fails to adequately train DPD on crowd control.**

123.    After the George Floyd protests, DPD Lieutenant John Coppedge was interviewed by Denver's Independent Monitor Nick Mitchell. Lieutenant Coppedge was a part of DPD's training academy. During that interview, Lieutenant Coppedge told Independent Monitor Mitchell that he saw DPD's response to the George Floyd protests as a total leadership failure, and that the officers on the ground were acting without any sort of leadership during the protests. Lieutenant Coppedge also revealed to Mr. Mitchell that the prevailing attitude at DPD is that training is not important.

124.     Mr. Mitchell also spoke to DPD Sergeant Erik Knutson after the George Floyd protests. Sergeant Knutson told Mr. Mitchell that he worked hard to develop a three-day field force operations class in 2015 and that in 2015 and 2016 he trained DPD officers using that field force operations class. However, in mid-2016, DPD decided that it would no longer provide field force training because it was too time intensive. Sergeant Knutson informed Mr. Mitchell that from what he observed of the DPD response to the George Floyd protests, the tactics used by DPD were not anything that would be taught in training.

125.     Another officer, Jesse Trudel, spoke during an IA interview after the George Floyd protests about the lack of training for line officers. Officer Trudel said that he only received field force training in the academy, and that amounted to only between four and eight hours of training. Officer Trudel said most of the training focused on how to properly don gear and gas masks, and that they only conducted an hour of field force training.

G.     **Denver's Independent Monitor, in a comprehensive report about the DPD response to the George Floyd protests, found that Denver's customs, practices, lack of training, and absence of supervision during crowd control situations violated policing standards and led to the use of excessive force.**

126.     In a December 8, 2020 report titled "The Police Response to the 2020 George Floyd Protests in Denver, an Independent Review" ("Independent Monitor Report") Independent Monitor Nick Mitchell outlined his findings based on his review of over two hundred hours of body-worn camera footage along with all other documentation preserved by Denver along, and access to over fifteen thousand hours of HALO camera footage. Mr. Mitchell's team also interviewed DPD officers, as outlined above, as part of the investigation.

127.     In the Independent Monitor Report, Mr. Mitchell found, during the George Floyd protests:

a.  DPD officers routinely failed to issue dispersal orders before using force to disperse crowds. Even when DPD officers did issue dispersal orders, those orders lacked information about dispersal routes and did not warn protesters that by remaining they would be subjected to force. Often, DPD officers failed to allow enough time and space for protesters to comply even if they wanted to.

b.  Denver routinely allowed DPD officers to deploy pepper balls without the proper training and certification on using pepper ball launchers and the appropriate circumstances for using pepper balls.

c.  DPD lacked internal controls on the use of force that could have allowed command staff to review uses of force while the events were unfolding. The lack of these controls prevented command staff from ensuring, in real time, that force was being used in conformity with DPD policies and training.

d.  DPD officers routinely used force in ways that were against standard police practices and that were extremely troubling.

e.  DPD had not made enough recent investments in crowd control and field force operations training to properly prepare officers for an event the size of the George Floyd protests.

f.  DPD devoted less attention to crowd control training in the years immediately preceding the George Floyd protests, which was reflected in the volume and frequency of crowd control and field force training in the years leading up to the George Floyd protests.

128.   Ultimately, Mr. Mitchell issued a lengthy list of recommendations for policing of future protests, which were not followed during the George Floyd protests, that would have

prevented the mass injuries inflicted by DPD officers and prevented the violation of the constitutional rights of protesters. Many of these recommendations were obvious, as they were based on widely known policing standards of which every police department in the nation, including DPD, is aware. DPD has not followed many of these recommendations and its failure to do so led to the violation of Mr. Smith's constitutional rights.

### H.    A federal jury found that Denver's policies, customs, practices, and training related to crowd control violated the Constitution.

129.    In March of 2022, there was a trial in the United States District Court for the District of Colorado involving claims that DPD officers had used excessive force against a group of eleven protesters during the George Floyd protests in Denver. The plaintiffs in the *Epps v. Denver* case claimed that Denver was liable for the violation of their rights because its officers violated their rights in accordance with Denver's policies, customs, practices, and training.

130.    During the *Epps v. Denver* trial, Independent Monitor Mitchell testified that DPD used force in ways that were extremely troubling. Mr. Mitchell also testified that he "frequently" heard from DPD officers "that they felt a need for greater emphasis on training in crowd management and field force operations."

131.    During the *Epps v. Denver* trial, DPD Commander Phelan testified under oath that he had not seen any video or documentation relating to the George Floyd protests that showed DPD officers using force on protesters in a manner inconsistent with Denver's policy, training, and practice, despite being shown multiple examples of outrageous and obviously excessive force.

132.    After the three-week trial, a federal jury returned a verdict finding that DPD officers had violated each protester's Fourth Amendment rights. The jury also found that Denver's policies, practices, and customs caused the violation of the plaintiffs' rights.

Additionally, the jury returned a verdict finding that Denver's failure to train its officers caused the violation of the plaintiffs' rights. Finally, the jury issued a finding that Denver had ratified its officers' violation of plaintiffs' rights, and that ratification had caused the violation of plaintiffs' rights.

133.    After finding Denver and a DPD officer liable, the jury awarded the plaintiffs a total of $14,000,000.

## V.  STATEMENT OF CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourth Amendment Violation — Excessive Force**
*Against Defendants Denver and Glasby*

134.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

135.    Defendant Glasby acted under color of state law in his capacity as a law enforcement officer for the DPD at all times relevant to the allegations in this Complaint.

136.    Defendants are "persons" under 42 U.S.C. § 1983.

137.    Plaintiff had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

138.    Defendant Glasby unlawfully seized Plaintiff by means of excessive physical force.

139.    Defendant had no warrant authorizing any seizure of Plaintiff.

140.    Defendant Glasby's actions were objectively unreasonable in light of the circumstances confronting him.

141.    Plaintiff had committed no crime that would legally justify the amount of force used by Defendant Glasby, Plaintiff gave Defendant Glasby no reason to fear for his safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

142.    Defendant Glasby did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

143.    Defendant Glasby recklessly created the situation in which he used force.

144.    Defendant Glasby's actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting him.

145.    At the time when Defendant Glasby used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure from unreasonable seizure through excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

146.    Defendant Glasby engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

147.    Defendant Denver has a custom, practice or policy of tolerating violations of the Fourth Amendment of the United States Constitution.

148.    Defendant Denver's customs, policies, and/or practices were the moving force behind Defendants' violation of Plaintiff's constitutional rights.

149.    Defendant Denver failed to properly supervise, train, and discipline its officers.

150.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiff suffered injuries, damages, and losses.

151.    Defendants' herein described acts or omissions were the moving force and the

legal, direct, and proximate cause of Plaintiff's injuries, damages and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the use of force, and other compensatory and special damages.

152.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Failure To Render Aid**
*Against Defendant Glasby*

153.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

154.    Defendant Glasby acted under color of state law in his capacity as a law enforcement officer for the DPD at all times relevant to the allegations in this Complaint.

155.    Defendant Glasby is a "person" under 42 U.S.C. § 1983.

156.    Defendant Glasby knew that, after he slammed Plaintiff head-first into the concrete, Plaintiff was suffering from an objectively obvious and serious medical need, as Plaintiff was unconscious.

157.    Despite this, Defendant Glasby deliberately failed to obtain appropriate treatment or help for Plaintiff's serious and obvious medical needs.

158.    With deliberate indifference to Plaintiff's constitutional right to appropriate treatment or help, as provided by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Defendant Glasby knowingly failed to call for emergent medical care and, instead, abandoned Plaintiff. He did so despite his knowledge of Plaintiff's obvious and

serious medical needs, thereby placing Plaintiff at risk of serious physical harm, including a brain bleed, nerve damage, and potentially death.

159.     All of the deliberately indifferent acts of Defendant Glasby were conducted within the scope of his official duties.

160.     Plaintiff had a clearly established right under the Fourteenth Amendment to the U.S. Constitution to be free from deliberate indifference to his known serious medical needs.

161.     Defendant Glasby knew or should have known of this clearly established right.

162.     Defendants' acts or omissions were the legal and proximate cause of Plaintiff's injuries.

163.     Defendant Glasby's acts and omissions caused Plaintiff's damages in that he suffered extreme physical and mental injuries and distress.

164.     Defendant Glasby engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

165.     As a direct and proximate cause and consequence of Defendant Glasby's unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

166.     Defendant Glasby's herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

### THIRD CLAIM FOR RELIEF[1]

---

[1] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

**C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 7**
**Excessive Force**
*Against Defendant Glasby*

167.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

168.    Defendant Glasby acted under color of state law in his capacity as a law enforcement officer for the DPD at all times relevant to the allegations in this Complaint.

169.    Defendant Glasby is a "peace officer" under C.R.S. § 24-31-901(3) and therefore subject to C.R.S. § 13-21-131.

170.    Plaintiff had a protected interest under Colo. Const. Art. II, Section 7 against being victimized by the use of excessive force at the hands of law enforcement personnel.

171.    Defendant Glasby unlawfully seized Plaintiff by means of excessive physical force.

172.    Defendant Glasby had no warrant authorizing any seizure of Plaintiff.

173.    Defendant Glasby's actions were objectively unreasonable in light of the circumstances confronting him.

174.    Plaintiff had committed no crime that would legally justify the amount of force used by Defendants Glasby, Plaintiff gave Defendant Glasby no reason to fear for his safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

175.    Defendant Glasby did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

176.    Defendant Glasby recklessly created the situation in which he used force.

177.    Defendant Glasby's actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting him.

178.     Defendant Glasby engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

179.     As a direct and proximate cause and consequence of Defendant Glasby's unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

180.     Defendant Glasby's herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

**FOURTH CLAIM FOR RELIEF**[2]
**C.R.S. § 13-21-131 — Colo. Const. Art. II, Section 25**
**Failure To Render Aid**
*Against Defendant Glasby*

181.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

182.     Defendant Glasby acted under color of state law in his capacity as a law enforcement officer for the DPD at all times relevant to the allegations in this Complaint.

183.     Defendant Glasby is a "peace officer" under C.R.S. § 24-31-901(3) and therefore subject to C.R.S. § 13-21-131.

184.     Defendant Glasby knew that, after he slammed Plaintiff head-first into the concrete, Plaintiff was suffering from an objectively obvious and serious medical need as Plaintiff was unconscious.

---

[2] Plaintiff brings these claims in good faith for the express purpose of extending and/or modifying existing precedent relating to C.R.S. § 13-21-131.

185.    Despite this, Defendant Glasby deliberately failed to obtain appropriate treatment or help for Plaintiff's serious and obvious medical needs.

186.    With deliberate indifference to Plaintiff's constitutional right to appropriate treatment or help, as provided by the Colo. Const. Art. II, Section 25, Defendant Glasby knowingly failed to call for emergent medical care and, instead, abandoned Plaintiff. He did so despite his knowledge of Plaintiff's obvious and serious medical needs, thereby placing Plaintiff at risk of additional serious physical harm, including a brain bleed, nerve damage, and potentially death.

187.    All of Defendant Glasby's deliberately indifferent acts were conducted within the scope of his official duties.

188.    Plaintiff had a clearly established right under the Fourteenth Amendment to the U.S. Constitution to be free from deliberate indifference to his known serious medical needs.

189.    Defendant Glasby knew or should have known of this clearly established right.

190.    Defendants' acts or omissions were the legal and proximate cause of Plaintiff's injuries.

191.    Defendant Glasby's acts and omissions caused Plaintiff's damages in that he suffered extreme physical and mental injuries and damages.

192.    Defendant Glasby engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

193.    As a direct and proximate cause and consequence of Defendant Glasby's unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

194.     Defendant Glasby's herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages

## FIFTH CLAIM FOR RELIEF
**Battery**
*Against Defendants Hayter's and Glasby*

195.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

196.     Defendant Glasby's conduct, as described herein, resulted in physical contact with Plaintiff. Plaintiff did not consent to such contact. The unwanted and uninvited physical contact included Defendant Glasby's physical assault of Plaintiff.

197.     Defendant Glasby intended to make harmful or offensive physical contact with Plaintiff.

198.     Defendant Glasby's contact with Plaintiff was harmful and/or offensive and caused Mr. Smith substantial injuries, damages, and losses, including but not limited to severe emotional distress and pain and suffering, non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

199.     Defendant Glasby was at all times acting within the course and scope of his employment or agency with Defendant Hayter's. Defendant Hayter's is vicariously liable for Defendant Glasby's actions and is liable for the acts and omissions of its authorized agent, Defendant Glasby, for the damages caused therefrom.

## SIXTH CLAIM FOR RELIEF
**Intention Infliction of Emotional Distress/Outrageous Conduct**

*Against Defendants Hayter's and Glasby*

200.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

201.     Defendant Glasby's conduct – picking Plaintiff up and slamming him headfirst into the concrete and then failing to call for emergency medical care – is so outrageous and so extreme that reasonable members of the community would regard such behavior as atrocious. In fact, members of the community *did* regard Defendant Glasby's conduct as atrocious, as demonstrated by their immediate and vocal condemnation, and the widespread circulation of a cellphone video of Glasby assaulting Mr. Smith, and Mr. Smith flying through the air and landing on the cement, unconscious.

202.     Defendant Glasby engaged in the herein described conduct with the intent of causing Plaintiff severe emotional distress, and/or in reckless disregard for whether his conduct would cause Plaintiff severe emotional distress.

203.     Defendant Glasby knew or should have known that his actions would cause Plaintiff severe emotional distress.

204.     Defendant Glasby's described acts were utterly intolerable, and would lead a reasonable member of the community to conclude that his conduct was extreme or outrageous.

205.     As a result of Defendant Glasby's conduct, Plaintiff has suffered actual economic damages and has suffered other injuries, damages, and losses, including but not limited to severe emotional distress and pain and suffering.

206.     Defendant Glasby was at all times acting within the course and scope of his employment or agency with Defendant Hayter's. Defendant Hayter's is vicariously liable for

Defendant Glasby's actions and is liable for the acts and omissions of its authorized agent, Defendant Glasby, for the damages caused therefrom.

**SEVENTH CLAIM FOR RELIEF**
**Negligence**
*Against Defendants Glasby and Hayter's*

207.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

208.    Plaintiff suffered a serious injury because of Defendant Glasby's actions.

209.    Defendant Glasby, as a bouncer for Defendant Hayter's, owed Plaintiff a duty to protect him from harm.

210.    Defendant Glasby was negligent in his decision to slam Plaintiff head-first into the concrete outside of Defendant Hayter's establishment.

211.    Defendant Glasby's negligence caused Plaintiff to suffer actual economic damages and other injuries, damages, and losses, including but not limited to severe emotional distress and pain and suffering.

212.    Defendant Glasby was at all times acting within the course and scope of his employment or agency with Defendant Hayter's. Defendant Hayter's is vicariously liable for Defendant Glasby's actions and is liable for the acts and omissions of its authorized agent, Defendant Glasby, for the damages caused therefrom.

213.    Defendant Hayter's was negligent in its supervision and training of Defendant Glasby. Defendant Hayter's knew that Defendant Glasby had been violent and caused harm to other patrons, but failed to take any actions further supervise and train Defendant Glasby, or to terminate him.

**EIGHTH CLAIM FOR RELIEF**
**Negligent Hiring and Supervision**

*Against Defendant Hayter's*

214.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

215.     Plaintiff suffered a serious injury because of Defendant Glasby's actions.

216.     Defendant Hayter's had a duty to its patrons to protect them from harm and to provide proper security of its premises and surrounding areas.

217.     Defendant Hayter's was negligent in the hiring and supervision of Defendant Glasby. Defendant Hayter's knew that Defendant Glasby had been violent and caused harm to other patrons but failed to take any actions further supervise and train Defendant Glasby, or to fire him. Defendant Hayter's gave Defendant Glasby unrestricted authority to use force without proper training or supervision.

218.     Defendant Hayter's negligence caused Plaintiff to suffer actual economic damages and other injuries, damages, and losses, including but not limited to severe emotional distress and pain and suffering.

## VI. <u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against each Defendant, and award him all relief allowed by law, including but not limited to the following:

A.     All appropriate relief at law and equity;

B.     Injunctive relief;

C.     Declaratory relief and other appropriate equitable relief;

D.     Economic losses on all claims as allowed by law;

E.      Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

F.      Punitive damages on all claims allowed by law and in an amount to be determined at trial;

G.      Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims allowed by law;

H.      Pre-and post-judgment interest at the lawful rate; and

I.      Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

DATED this 12th day of June 2024.

NEWMAN | MCNULTY, LLC

*s/ Mari Newman*
_____
Mari Newman
Andy McNulty
1490 N. Lafayette Street, Suite 304
Denver, CO 80218
(720) 850-5770
Mari@Newman-McNulty.com
Andy@Newman-McNulty.com

ATTORNEYS FOR PLAINTIFF